1  **Lewis R. Landau** (CA Bar No. 143391)
   **Attorney-at-Law**
2  23564 Calabasas Road, Suite 104
   Calabasas, California 91302
3  Voice and Fax: (888) 822-4340
   Email:  Lew@Landaunet.com
4
   [Proposed] Attorney for Debtor and
5  Debtor in Possession

6

7                      **UNITED STATES BANKRUPTCY COURT**

8                      **CENTRAL DISTRICT OF CALIFORNIA**

9                      **SAN FERNANDO VALLEY DIVISION**

10

11 | In re | Case No.: 1:11-bk-10200 MT |

12 Nurses in Partnership, Inc.,           Chapter 11

13              Debtor.                    **EMERGENCY FIRST DAY MOTION FOR**
                                           **1.   INTERIM AND FINAL ORDERS**
14                                         **UNDER 11 U.S.C. §§ 105(a), 361, 362, 363**
                                           **AND 364 AND FEDERAL RULES OF**
15                                         **BANKRUPTCY PROCEDURE RULES**
                                           **4001, 6004, AND 9014: AUTHORIZING**
16                                         **DEBTOR (A) TO OBTAIN SECURED**
                                           **SUPERPRIORITY POST-PETITION**
17                                         **FINANCING; (B) TO USE CASH**
                                           **COLLATERAL; (C) GRANTING**
18 Debtor's EIN: 35-2182319               **ADEQUATE PROTECTION; (D)**
   Address:  22144 Clarendon Street, Suite 100  **MODIFYING THE AUTOMATIC STAY;**
19              Woodland Hills, CA  91367  **(E) SETTING FINAL HEARING; AND (F)**
                                           **GRANTING RELATED RELIEF;**
20                                         **2.   AUTHORIZING PAYMENT OF**
                                           **PREPETITION NON-INSIDER**
21                                         **PAYROLL; AND**
                                           **3.   LIMITING NOTICE**
22

23                                         *Hearing Date and Time to be Set*
                                           *Pursuant to Court Order*
24
                                           Date:      January ___, 2011 (*to be set*)
25                                         Time:                 (*to be set*)
                                           Place:     Courtroom 302; Judge Tighe
26                                                     United States Bankruptcy Court
                                                       21041 Burbank Blvd.; 3rd Floor
27                                                     Woodland Hills, California  91367

28

# CONCISE SUMMARY OF RELIEF REQUESTED

Nurses in Partnership, Inc. ("Debtor" or "NIPI"), the debtor and debtor in possession in the above captioned chapter 11 case, hereby moves the court, on an emergency basis, for interim and final orders pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Federal Rule of Bankruptcy Procedure ("FRBP") 4001, 6004 and 9014 authorizing and approving Debtor's entry into a Debtor in Possession loan ("DIP Loan") with Crestmark Bank, a Michigan banking corporation ("Crestmark" or "DIP Lender"), providing for accounts receivable financing.  True and correct copies of the proposed loan documents consisting of an amendment to the Debtor's existing promissory note and assumption of the underlying loan documents (the "DIP Loan Documents"), are attached hereto as Exhibit 2.  Debtor further seeks authorization for an unsecured interest free insider advance from Mrs. Barsam (wife of CEO Ephraim Barsam) to the Debtor of $25,000 to be repaid upon the availability of funds.  Debtor also seeks authority to use cash collateral per the Budget attached hereto as Exhibit 1 and pay prepetition payroll set forth on Exhibit 3 hereto. Debtor finally seeks an administrative order limiting notice.

The relief requested herein is appropriate because the Debtor has no other source of cash other than financing proceeds and cash collateral and the Debtor must use cash to continue in business and fund operations in support of its overall reorganization strategy.  The Debtor has no viable alternate financing and no such source of financing is available on terms more favorable than those offered by the DIP Lender.

The motion is based on this motion and concise statement, the attached Memorandum of Points and Authorities and exhibits hereto, the Declaration of Ephraim Barsam ("Barsam Declaration") and Declaration of Lewis R. Landau ("Landau Declaration") filed concurrently herewith, all pleadings, papers and records on file with this Court, and upon such other evidence, oral or documentary, as may be presented to this Court at or prior to the hearing on this Motion.

The following concise statements of the relief requested are presented pursuant to the requirements of FRBP 4001(b)(1) and (c)(1):

///

///

**Cash Collateral Motion Concise Statement:**

1.      *The purposes for the use of cash collateral.*  The Debtor requires the use of cash collateral to continue operations in accordance with the budget attached hereto as Exhibit 1.

2.      *The name of each entity with an interest in cash collateral.*  The Debtor believes that the entities which may assert an interest in cash collateral are, in addition to the DIP Lender: (1) the United States Internal Revenue Service ("IRS"); and (2) Enhanced Colorado Issuer, LLC ("Enhanced") as collateral agent.  A complete Uniform Commercial Code ("UCC") search reflecting all perfected security interests in accounts or accounts receivable is attached to the concurrently filed Landau Declaration as Exhibit 1 thereto.

3.      *The material terms, including duration, of the use of cash collateral.*  The Debtor seeks to use cash collateral in accordance with the budget attached hereto as Exhibit 1.  The duration of cash collateral use shall be initially for the interim period between the preliminary hearing on the Motion and final hearing thereon.  Thereafter, the Debtor seeks authorization to use cash collateral on a final basis through and including confirmation of a chapter 11 plan.

4.      *Any liens, cash payments, or other adequate protection that will be provided to each entity with an interest in the cash collateral or, if no additional adequate protection is proposed, an explanation of why each entity's interest is adequately protected.*  Liens, cash payments and other forms of adequate protection are proposed to be granted to the DIP Lender under the DIP Loan Documents (see next section herein).  Subject to the senior DIP financing, other lienholders shall be granted a replacement lien of the same validity, priority and extent of their prepetition lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property.  *See*, 11 U.S.C. § 361(2).

**Financing Motion Concise Statement:**

1.      *The location within the relevant documents of, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits, and borrowing conditions.*  All terms of the proposed DIP Loan are contained in the DIP Loan Documents which consists of an amendment to the existing promissory

1    note and incorporation of the pre-petition loan documents and the proposed order on the Motion

2    all of which are collectively attached thereto as Exhibit 2.

3        The non-default interest rate on the DIP Loan is 5% in excess of Wall Street Journal prime.

4    The fee for the DIP Loan is $7,500.  The maturity date of the DIP Loan is based on Crestmark's

5    demand.  The DIP Lender shall receive first priority liens on all of the Debtor's property to secure

6    the DIP Loan.  The borrowing limit is $2,000,000 or up to 85% of Eligible Accounts.  The critical

7    borrowing conditions include entry of the proposed order in a form acceptable to the DIP Lender.

8    Events of default include the following:

9    • the Debtor's failure to perform or comply with any of the terms, conditions, or

10       covenants of the financing order;

11   • The Debtor's failure to perform or comply with any of the terms, conditions, or

12       covenants of the pre-petition loan documents;

13   • A deterioration in the advance formula from what it was on the petition date;

14   • The termination of the financing order by its own terms, operation of law or court

15       order;

16   • The dismissal of this Bankruptcy Case;

17   • The appointment of a trustee under the Bankruptcy Code; and

18   • The conversion of the Bankruptcy Case to a case under another chapter of the

19       Bankruptcy Code.

20       2.    Pursuant to FRBP 4001(c)(1)(B)(i)-(xi), the motion shall describe the nature and

21   extent of eleven (11) specific terms subject to special attention.  The concise statement shall

22   nonetheless list each such provision and identify its location in the documents and identify

23   whether any such provision is proposed to remain in effect if interim approval is granted but final

24   relief is denied.  The eleven (11) provisions contained in FRBP 4001(c)(1)(B)(i)-(xi) are

25   substantially similar to the disclosure requirements contained in Local Bankruptcy Rule 4001-2

26   and Local Bankruptcy Form 4001-2. Form 4001-2 is filed concurrently herewith and reference is

27   made thereto for the list and location of terms subject to special attention.  All such provisions are

28   proposed to remain in effect to the extent of interim advances made under the DIP Loan.

1    *Wherefore*, Nurses in Partnership, Inc. respectfully prays that the Court grant this motion,

2    set a final hearing on the motion in approximately fifteen (15) days and grant such other and

3    further relief as the Court deems just and proper under the circumstances.

4    Dated:  January 6, 2011                    **Lewis R. Landau**
                                                **Attorney at Law**

5

6                                               By:*/s/ Lewis R. Landau*

7                                               Lewis R. Landau
                                                [Proposed] Attorney for the Debtor

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.     The Chapter 11 Bankruptcy Case and Jurisdiction.**

On January 6, 2011 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A committee of creditors holding unsecured claims has not yet been appointed.  The Court has core jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (D), (K) & (M).

**B.     The Debtor's Business and Events Leading to Filing of the Chapter 11 Case.**

Nurses in Partnership, Inc. was founded in October, 2002 as a traveling nurse staffing company supplying contract nursing services to hospitals nationwide for a 13 week contract period.  The Debtor pays or reimburses salary, travel costs, medical benefits and temporary housing to its contract nurses.  The Debtor presently has 27 nurses under contract working at various hospitals and anticipates increasing its nursing staff to over 30 over the next two (2) months.

The Debtor owns two (2) other subsidiaries and provides administrative support to such subsidiaries in return for a fixed monthly charge.  These two (2) subsidiaries are Healthtalent, Inc. and TechGroup, Inc.  Such administrative consolidation enables the group to realize volume discounts for insurances and other ancillary services.  Healthtalent operates on a fully consolidated basis with NIPI and provides nursing services for terms longer than 13 weeks.  TechGroup operates on a partially consolidated basis with NIPI and provides staffing services consisting of non-nursing administrative personnel for medical offices, radiation technology personnel, allied health, per diem and travel nursing.  All three (3) affiliates finance their receivables with Crestmark.

In March, 2009 the Debtor's operations were negatively impacted by the economic recession and two (2) of its major clients sought bankruptcy relief.  The Debtor turned to

1   Enhanced, its private equity investment group, and requested additional funding in order to

2   continue operations.  The investors requested that the Debtor find a suitable acquisition target

3   whereby the investor would provide additional funding for an enlarged enterprise.  The investor's

4   strategy contemplated adding "bolt-on" acquisitions thus reducing overall administrative

5   expenses.

6          In October, 2009 the Debtor completed the acquisition of TechGroup, Inc., however no

7   investment was forthcoming from Enhanced.  Enhanced did however commit to injecting funds

8   with the next acquisition.  Thus, the Debtor next worked to acquire OfficeWorks, Inc.

9   ("OfficeWorks") and concluded such acquisition in May, 2010.

10         In connection with the OfficeWorks acquisition, the Debtor and Enhanced contractually

11  agreed to a recapitalization plan.  This plan included a significant injection of cash into NIPI,

12  which would have enabled the Company to have increased working capital and to start to take

13  advantage of the increase in the demand for skilled nurses.  On the basis of this transaction, the

14  Debtor also concluded an agreement with the IRS to pay off delinquent taxes and made an initial

15  payment of $150,000 to the IRS with funding from Enhanced.

16         Unfortunately, Enhanced defaulted on the refinancing agreement and diverted the

17  acquisition into a new entity in which the Debtor holds an option to acquire a 49% interest for

18  $200,000.  Enhanced valued this business at $2,500,000.  After the recapitalization plan failed, the

19  Debtor became unable to meet all of its commitments, most significantly the agreement with the

20  IRS.

21         The principal cause of the chapter 11 filing was the recordation of an IRS tax lien, a copy

22  of which is attached hereto as Exhibit 4.  Upon the filing of the tax lien, Crestmark ceased making

23  advances to NIPI.  Thus, NIPI required chapter 11 relief in order to continue operations.

24         In the last two (2) months, the Debtor has reduced its administrative staffing by six (6)

25  persons leaving a core of seven (7) administrative personnel.  The Debtor has also sublet 50% of

26  its corporate office space to further reduce overhead.  Mr. Barsam, Debtor's CEO, has deferred

27  approximately $100,000 of salary and bonus payments to further support operations.  Other board

28  members have also reduced salary levels to assist the Debtor in continuing operations.

**C.      Summary of Assets and Liabilities.**

The Debtor's assets and liabilities are summarized as follows:

**Assets.**

The Debtor's assets are summarized in its current balance sheet a true and correct copy of which is attached hereto as Exhibit 5.   As set forth in Exhibit 5, the Debtor has a negative cash balance.  The Debtor has receivables of approximately $293,330, most of which are security for Crestmark's existing receivables financing standing at a balance of $216,237.

**Liabilities.**

The Debtor's material liabilities are as follows:

1.   Crestmark.  Balance due $216,237.

2.   Payroll tax liabilities:  IRS: $627,951 and EDD: $285,023.

3.   Trade debt:  $1,265,468 (some of which is disputed).

4.   Enhanced as collateral agent for insiders, affiliates and related parties Enhanced Capital, various Markowicz trusts, Pondfield Investments, EM Investments , Jon Kaiden, Andy Paul, Ephraim Barsam and David McGreavy: $4,530,177 (including accrued interest). This secured indebtedness is contractually subordinated to Crestmark.

5.   Various other liabilities are reflected on the Exhibit 5 balance sheet.

**D.      The Need for Postpetition Financing; Proposed Operating Budget.**

The Debtor does not have sufficient cash from operations to continue in business without post-petition financing.  Thus, approval of the DIP Loan and Barsam advance is both necessary and appropriate.

Attached hereto as Exhibit 1 is the Debtor's proposed operating budget for the period through March 4, 2011 ("Budget").  As set forth therein, the Debtor presently has a zero cash balance and must have access to operating cash in order to continue in business.

While the Crestmark DIP Loan will begin to provide the Debtor with liquidity to fund operations, the Debtor also requires a one-time $25,000 advance from Mrs. Barsam to maintain normal operations.  This interest free unsecured advance is proposed to be repaid as set forth in the Budget when funds become available.

1    If the Debtor is able to obtain financing from the DIP Lender through the DIP Loan as well

2 as the Barsam advance, the Debtor will have sufficient availability under the DIP Loan to return to

3 profitability over a period of approximately two (2) months. A longer term budget is currently

4 being prepared and will be filed in connection with the final hearing on the Motion.

5 **E.     The Proposed DIP Loan.**

6    The terms of the proposed DIP Loan are contained in Exhibit 2. In summary, the DIP

7 Loan provides for the following:

8    The principal terms of the DIP Loan are as follows:

9    Borrower: Debtor, Healthtalent, Inc., and TechGroup, Inc. collectively.

10    Lender: Crestmark Bank, a Michigan banking corporation.

11    Commitment: Lender will advance up to the lesser of $2,000,000 or up to 85% of Eligible

12 Accounts pursuant to the loan documents attached hereto as Exhibit 2.

13    Term: Payable on demand.

14    Priority and Liens: First priority secured lien on all assets and superpriority administrative

15 expense subject to $10,000 carve out.

16    Use of Proceeds: Proceeds of the DIP Loan shall be used in accordance with the budget

17 attached hereto as Exhibit 1.

18    Fees and Expenses: Lender's reasonable expenses (including reasonable attorneys' fees)

19 plus a loan fee of $7,500.

20    Interest and Fees : All outstanding advances under the DIP Loan shall bear interest at the

21 rate equal to 5% over Wall Street prime.

22    Events of Default: Events of default include the following:

23    • the Debtor's failure to perform or comply with any of the terms, conditions, or
24      covenants of the financing order;

25    • The Debtor's failure to perform or comply with any of the terms, conditions, or
26      covenants of the pre-petition loan documents;

27    • A deterioration in the advance formula from what it was on the petition date;

28

- The termination of the financing order by its own terms, operation of law or court order;

- The dismissal of this Bankruptcy Case;

- The appointment of a trustee under the Bankruptcy Code; and

- The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code.

Certain Waivers:  The Debtor waives any rights that it may have to seek authority (i) at any time during the case, whether or not an Event of Default has occurred, (a) to obtain postpetition loans or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code unless such authority results in the obligations under the DIP Loan being indefeasibly paid in full; (b) to propose or support a plan of reorganization to the extent such act or plan would result in an Event of Default; or (ii) at any time during the case after the occurrence of an Event of Default, to seek relief under the Bankruptcy Code, including without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Lender; or (c) to surcharge the DIP Lender's collateral under 11 U.S.C. § 506.

Relief from Automatic Stay:  The automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lender to exercise its remedies for post-petition advances.

The foregoing summary is for general reference only.  The DIP Loan Documents attached hereto as Exhibit 2 should be reviewed for all material terms.

///
///
///
///
///
///
///
///

## II.

## 11 U.S.C. §§ 105, 361, 362, 363, 364 AND FRBP RULES 4001, 6004 AND 9014

## EMPOWER THE COURT TO APPROVE THE DIP LOAN

## AND USE OF CASH COLLATERAL ON AN INTERIM BASIS

A.    **The Debtor has Satisfied Bankruptcy Code Requirements to Obtain Approval of the**

   **DIP Loan and Use Cash Collateral.**

   *1.    The DIP Credit Facility Should be Approved under 11 U.S.C. § 364(d).*

   Pursuant to 11 U.S.C. § 364(d), the Debtor may obtain financing on a senior secured basis

upon satisfaction of certain conditions.  Section 364(d) states as follows:

> (d)(1) The court, after notice and a hearing, may authorize the
> obtaining of credit or the incurring of debt secured by a senior or
> equal lien on property of the estate that is subject to a lien only if—
>    (A) the trustee is unable to obtain such credit otherwise; and
>    (B) *there is adequate protection of the interest of the holder*
> *of the lien on the property of the estate on which such senior or*
> *equal lien is proposed to be granted.*
> (2) In any hearing under this subsection, the trustee has the burden
> of proof on the issue of adequate protection.

11 U.S.C. § 364(d) (emphasis added).

   Under the express terms of 11 U.S.C. § 364(d), the Debtor must carry its burden of proving

two requirements to obtain authorization to incur senior secured financing: (1) that the Debtor is

unable to obtain such credit otherwise; and (2) that existing lienholders are adequately protected.

Both of these requirements are satisfied in regard to the proposed DIP Loan.

   By this Motion, the Debtor is seeking Court authority to enter into the DIP Loan with the

DIP Lender as well as an interest free unsecured advance from Mrs. Barsam of $25,000.  The

Debtor is requesting this relief as the Debtor is in urgent need of post-petition financing in order to

insure that there is no interruption in its ability to fund its operating expenses.  Such financing is

the only source of working capital for the Debtor.  As a result, the proposed financing is essential

to the Debtor's ability to continue operations during the pendency of the Chapter 11 case and

continue to work toward confirming a plan of reorganization.

1    In <u>In re Defender Drug Stores, Inc.</u>, 145 B.R. 312 (B.A.P. 9th Cir. 1992), the debtor was

2   authorized to obtain additional secured financing from its pre-petition lender, upon terms which

3   were very favorable to the creditor, including an enhancement fee and superior lien upon

4   encumbered assets.  <u>Id.</u> at 317.  The court specifically recognized that: "[d]ebtors in possession

5   generally enjoy little negotiating power with a proposed lender, particularly when the lender has a

6   pre-petition lien on cash collateral."  <u>Id.</u>  The court in <u>Defender Drug Stores</u> acknowledged that it

7   must, to some extent, defer to the "reasonable exercise of the debtor's business judgment", so long

8   as an "unwarranted benefit of the post-petition lender" does not result.  *Id.*, *see also*, <u>In re Simasko

9   Production Co.</u>, 47 B.R. 444 (Bankr. D. Colo. 1985).

10    As set forth in the Barsam Declaration, the Debtor has been unable to obtain financing on

11   an unsecured basis, nor find financing on more favorable terms.  Accordingly, the Debtor is

12   entitled to obtain senior secured credit under Bankruptcy Code Section 364(d) and enter into the

13   proposed DIP Loan.

14    **2.    *The Use of Cash Collateral is Authorized Based on the Same Adequate***

15    ***Protection Analysis Supporting Approval of the DIP Credit Facility.***

16    As several secured creditors have an interest in the Debtor's cash receipts, this Motion also

17   seeks authority to use cash collateral in accordance with the budget attached hereto as Exhibit 1.

18   This aspect of the Motion is brought pursuant to 11 U.S.C. § 363(c)(2), (3) and 363(e).  These

19   Code sections state:

20    (c)(2)  The trustee may not use, sell, or lease cash collateral under
          paragraph (1) of this subsection unless—

21          (A) each entity that has an interest in such cash collateral
          consents; or

22          (B) the court, after notice and a hearing, authorizes such use,
          sale, or lease in accordance with the provisions of this section.

23

24    (3) Any hearing under paragraph (2)(B) of this subsection may be a
          preliminary hearing or may be consolidated with a hearing under

25          subsection (e) of this section, but shall be scheduled in accordance
          with the needs of the debtor. If the hearing under paragraph (2)(B)

26          of this subsection is a preliminary hearing, the court may authorize
          such use, sale, or lease only if there is a reasonable likelihood that

27          the trustee will prevail at the final hearing under subsection (e) of

28

this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(e)  Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease *as is necessary to provide adequate protection of such interest.* This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(c)(2), (3), (e) (emphasis added).

Thus, cash collateral may be used under section 363, if the Court finds that the various secured creditor's secured claims are adequately protected.

Although the Debtor shoulders the burden of proving adequate protection, existing lienholders must carry their own burden of proving the validity, priority and extent of their liens. This burden is statutorily mandated by § 363(p)(2).  *See*, Chequers Investment Assoc. v. Hotel Sierra Vista Ltd. Partnership (In re Hotel Sierra Vista Ltd. Partnership), 112 F.3d 429, 434 (9th Cir. 1997).  To prove the extent of their liens, existing lienholders must prove a validly perfected security interest in post-petition revenues to which such lienholder's rights attach.  Id.

Based on all the foregoing, the Debtor should be authorized to use cash collateral in accordance with the Budget attached hereto as Exhibit 1.

### 3.     *Adequate Protection is Defined Under 11 U.S.C. § 361.*

As set forth above, the DIP Loan and the Debtor's use of cash collateral both require that the Court find adequate protection of existing secured creditor's lien interests.  Adequate protection is defined in section 361 as follows:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by -
(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

1          (2) providing to such entity an additional or replacement lien to the
         extent that such stay, use, sale, lease, or grant results in a decrease in

2          the value of such entity's interest in such property; or
         (3) granting such other relief, other than entitling such entity to

3          compensation allowable under section 503(b)(1) of this title as an
         administrative expense, as will result in the realization by such

4          entity of the indubitable equivalent of such entity's interest in such

5          property.

6   11 U.S.C. § 361.

7        Thus, according to the statute, the key question is whether the value of the secured

8 creditor's collateral is decreasing and whether the proposed form of adequate protection provides

9 the creditor with the indubitable equivalent of such entities' interest in the used property.  <u>See</u>,

10 <u>Farmers Home Administration v. Arnold and Baker Farms (In re Arnold and Baker Farms)</u>, 177

11 B.R. 648 (B.A.P. 9th Cir. 1994) (discussing history of indubitable equivalent standard), <u>affirmed</u>,

12 85 F. 3d 1415 (9th Cir. 1996).

13        As will be shown herein, the interests of existing lienholders are adequately protected

14 notwithstanding the DIP Loan and the use of cash collateral.

15 **B.**      **Debtor Cannot Obtain More Favorable Financing Terms on Either an Unsecured or**

16           **Equally Secured Basis.**

17        If unsecured credit allowable as an administrative expense under Bankruptcy Code Section

18 364(b) or (c) cannot be obtained, the court, after notice and a hearing, may authorize the obtaining

19 of credit or the incurring of debt with special priority.  In <u>In re Sky Valley, Inc.</u>, 100 B.R. 107

20 (Bankr. N.D. Ga. 1988), the court duly considered the nature of the debtor's ski resort operation

21 and its location in determining the extent to which the debtor had to search for alternative and

22 more favorable financing.  In <u>Sky Valley</u>, the court recognized that there was a limited pool of

23 potential creditors, in that they would be likely either: (a) to hold a pre-petition security interest in

24 Debtor's property and thus, is already at risk; or (b) to do business in the community surrounding

25 the resort and, thus, is interested in preserving community land valued by preserving Debtor's

26 resort.  <u>Id.</u> at 113.  The bankruptcy court recognized that in circumstances such as these, "it would

27 be unrealistic and unnecessary to require Debtor to conduct such an exhaustive search for

28 financing."  <u>Id.</u>

1    A requirement in the granting of priority financing is that the debtor has sought, and was

2    unable to obtain, alternate financing without disruption of the preexisting priority amongst the

3    secured creditors.  Relevant cases indicate that a debtor need not contact every potential lender,

4    but the debtor must demonstrate a significant effort that is fair, reasonable, and adequate to carry

5    the burden required by Bankruptcy Code Section 364(d).  In re Tenney Village Co., 104 B.R. 562

6    (Bankr. D. N.H. 1989); In re Reading Tube Industry, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987); In

7    re Saint Mary Hospital, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988).

8    Despite its efforts, and other than the Barsam advance, the Debtor has been unable to

9    procure other financing in the form of unsecured credit allowable under § 503(b)(1) as an

10    administrative expense, solely in exchange for the grant of an administrative expense priority

11    pursuant to § 364(c)(1) or solely in exchange for granting junior or equal priority liens.  See,

12    Barsam Declaration.  The DIP Lender is the only entity that has agreed to provide post-petition

13    financing, however, such commitment is conditioned upon all the terms of the DIP Loan.

14    Based on the foregoing, the Debtor has satisfied the first requirement for obtaining senior

15    secured financing and the Motion should be granted.

16    **C.    Existing Lienholders are Adequately Protected.**

17    When a post-petition creditor is granted a secured priority interest over an existing

18    prepetition creditor's interest in collateral, the prepetition creditor must be given adequate

19    protection of its interest.  The same adequate protection analysis applies to the use of cash

20    collateral.

21    Adequate protection is an elastic concept and includes the forms of adequate protection

22    listed in 11 U.S.C. § 361.  Herein, the Debtor proposes replacement liens for existing prepetition

23    secured lenders of the same validity, priority and extent as such existing liens to the extent that

24    such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such

25    property.  Such replacement liens will then attach to enhanced collateral values generated by the

26    Debtor's continuing operations.  Such "operational adequate protection" is a recognized form of

27    adequate protection under the Code.  See, In re Dynaco, 162 B.R. 389 (Bankr. D. N.H. 1993).

28

1    Herein, since Crestmark will receive security for each such 85% advance on an account

2    receivable, there is no diminution in the value of any existing secured creditor's collateral position.

3    By continuing operations, the Debtor will enhance its collateral values.  As set forth in the Exhibit

4    1 Budget, over the first two (2) months of operations, the Debtor will accrue $70,000 in cash thus

5    enhancing the collateral base for all existing secured creditors.

6    As such, existing lienholders are adequately protected as required under sections 363(e)

7    and 364(d)(1) notwithstanding the senior liens granted under the DIP Loan.  As such, the DIP

8    Loan and use of cash collateral should be approved.

9    **III.**

10    **THE DEBTOR SHOULD BE AUTHORIZED TO PAY PREPETITION PAYROLL TO**

11    **AVOID IMMEDIATE AND IRREPARABLE HARM TO THE ESTATE**

12    The Debtor's has a weekly pay period that runs one (1) week in arrears.  Based on the

13    Debtor having filed its chapter 11 petition on January 6, 2011, payroll for the December 27, 2010

14    through January 5, 2011 pay period is earned and constitutes a pre-petition claim for employees.

15    A schedule reflecting non-insider and insider payroll for this prepetition period is attached hereto

16    as Exhibit 3.

17    As a staffing company, the Debtor must pay its employees in full in order to maintain the

18    going concern value of its business.  The Debtor believes that the failure to pay any prepetition

19    payroll will result in a loss of employee morale and employee resignations at this critical juncture

20    early in the chapter 11 case.  The Debtor must maintain its employee relationships in order to

21    effectively reorganize.

22    All employees listed on Exhibit 3 continue to be employed by the Debtor.  The proposed

23    payment of prepetition payroll will not render the Debtor administratively insolvent based on the

24    projections of future operations.  *See*, LBR 2081-1(a)(6).

25    All Exhibit 3 amounts qualify for priority claim status under 11 U.S.C. § 507(a)(4).  Since

26    the Debtor intends to reorganize and confirm a plan, the Debtor would be required to pay such

27    claims in full under any plan.  11 U.S.C. § 1129(a)(9)(B).  The Debtor thus requests authority to

28    pay the prepetition payroll amounts set forth on Exhibit 3 and all payroll related taxes on such

1   payroll under the doctrine of necessity and 11 U.S.C. § 105(a), as necessary to support the

2   reorganization of the Debtor.  *See*, <u>Burchinal v. Central Washington Bank (In re Adams Apple,</u>

3   <u>Inc.)</u>, 829 F.2d 1484, 1490 (9th Cir. 1987); <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174 (Bankr. S.D.

4   N.Y. 1989); <u>In re Lehigh & New England Railway Co.</u>, 657 F.2d 570, 581 (3d Cir. 1981).

5   Alternatively, such payments constitute ordinary course of business payments and if authorized,

6   such payments can be paid under 11 U.S.C. § 549.

7        Although Exhibit 3 reflects insider payroll, the Debtor does not seek to pay such amounts

8   at the interim hearing on this motion.  The Debtor will request such authorization at a final hearing

9   on this motion and in conjunction with Notices of Setting/Increasing Insider Compensation served

10  pursuant to United States Trustee guidelines.

11       Based on all the foregoing, the Court should approve payment of prepetition non-insider

12  payroll as set forth on Exhibit 3.

13                                    **IV.**

14                  <u>**DEBTOR REQUESTS AN ORDER LIMITING NOTICE**</u>

15       Finally, Debtor requests an order limiting notice to alleviate the administrative burden

16  created by having to mail all notices to all creditors.  The Debtor has approximately 100 parties in

17  interest listed on its master mailing list.  The Debtor is requesting that the Court enter an order

18  limiting notice such that, with the exceptions set forth below, service of notice of matters in this

19  case shall be limited to the following parties: (a) the Office of the United States Trustee; (b) the

20  parties listed on the "List of Creditors Holding 20 Largest Unsecured Claims" or, if appointed

21  under Bankruptcy Code section 1102, to the official committee of unsecured creditors (the

22  "Committee"), in lieu of the Debtor's twenty largest unsecured creditors or its counsel; (c) any

23  party holding a security interest in the Debtor's assets (herein "Secured Creditors"); (d) any party

24  against whom direct relief is sought by a motion, application or otherwise; and (e) all parties

25  receiving Notices of Electronic Filing ("NEF") through the Court's Electronic Case Filing system.

26  Notwithstanding the foregoing limitation, notice of the matters set forth below shall be served

27  upon all creditors and equity interest holders:

28                  A.  The notice of commencement of the case;

B.  Any first meeting of creditors;
C.  The hearing on any motion for the sale of substantially all of the assets of the Debtor's estate;
D.  Any bar date for the filing of proofs of claim;
E.  The time fixed for filing objections to, and the hearing to consider confirmation of, any chapter 11 plan in this case;
F.  The hearing on any motion for the dismissal of the case or for the conversion of the case to chapter 7 of the Bankruptcy Code; and
G.  The time fixed to accept or reject any proposed modification of a chapter 11 plan in this case (to the extent that the proposed modification requires notice to parties in interest affected thereby).

FRBP rules 2002 and 9007 provide authority for the relief requested herein.  Similarly, FRBP 9007 affords the Court general authority to regulate notices.  Pursuant to FRBP 2002 and 9007, this Court has the authority to limit the manner of service of notice in the Debtor's case.

No party will be prejudiced by the proposed limitation on notice procedures since any parting in interest that desires to receive notice of all matters in this case may, by submitting a request for courtesy NEF delivery, receive such notices.  Therefore, in order to avoid unnecessary expenses to the estate in this small business case, the relief requested herein should be granted.

Based on all the foregoing, the Court should grant the requested relief.

## V.

## CONCLUSION

**WHEREFORE**, based on all the foregoing, Nurses in Partnership, Inc. respectfully requests that the Court enter the proposed form of interim order lodged concurrently herewith approving the DIP Loan and Barsam advance, authorizing the use of cash collateral, payment of prepetition payroll and limiting notice, setting a final hearing thereon, and granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  January 6, 2011

**Lewis R. Landau**
**Attorney at Law**


By:*/s/ Lewis R. Landau*
Lewis R. Landau
[Proposed] Attorney for the Debtor

### DECLARATION OF EPHRAIM BARSAM

I, Ephraim Barsam, do hereby declare:

     1.     I am the Chief Executive Officer of Nurses in Partnership, Inc. ("Debtor" or "NIPI") and I have personal knowledge of the facts set forth herein. On January 6, 2011 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. A committee of creditors holding unsecured claims has not yet been appointed.

     2.     Nurses in Partnership, Inc. was founded in October, 2002 as a traveling nurse staffing company supplying contract nursing services to hospitals nationwide for a 13 week contract period. The Debtor pays or reimburses salary, travel costs, medical benefits and temporary housing to its contract nurses. The Debtor presently has 27 nurses under contract working at various hospitals and anticipates increasing its nursing staff to over 30 over the next two (2) months.

     3.     The Debtor owns two (2) other subsidiaries and provides administrative support to such subsidiaries in return for a fixed monthly charge. These two (2) subsidiaries are Healthtalent, Inc. and TechGroup, Inc. Such administrative consolidation enables the group to realize volume discounts for insurances and other ancillary services. Healthtalent operates on a fully consolidated basis with NIPI and provides nursing services for terms longer than 13 weeks. TechGroup operates on a partially consolidated basis with NIPI and provides staffing services consisting of non-nursing administrative personnel for medical offices, radiation technology personnel, allied health, per diem and travel nursing. All three (3) affiliates finance their receivables with Crestmark.

     4.     In March, 2009 the Debtor's operations were negatively impacted by the economic recession and two (2) of its major clients sought bankruptcy relief. The Debtor turned to Enhanced, its private equity investment group, and requested additional funding in order to continue operations. The investors requested that the Debtor find a suitable acquisition target

1  whereby the investor would provide additional funding for an enlarged enterprise.  The investor's

2  strategy contemplated adding "bolt-on" acquisitions thus reducing overall administrative

3  expenses.

4      5.      In October, 2009 the Debtor completed the acquisition of TechGroup, Inc.,

5  however no investment was forthcoming from Enhanced.  Enhanced did however commit to

6  injecting funds with the next acquisition.  Thus, the Debtor next worked to acquire OfficeWorks,

7  Inc. ("OfficeWorks") and concluded such acquisition in May, 2010.

8      6.      In connection with the OfficeWorks acquisition, the Debtor and Enhanced

9  contractually agreed to a recapitalization plan.  This plan included a significant injection of cash

10  into NIPI, which would have enabled the Company to have increased working capital and to start

11  to take advantage of the increase in the demand for skilled nurses.  On the basis of this transaction,

12  the Debtor also concluded an agreement with the IRS to pay off delinquent taxes and made an

13  initial payment of $150,000 to the IRS with funding from Enhanced.

14      7.      Unfortunately, Enhanced defaulted on the refinancing agreement and diverted the

15  acquisition into a new entity in which the Debtor holds an option to acquire a 49% interest for

16  $200,000.  Enhanced valued this business at $2,500,000.  After the recapitalization plan failed, the

17  Debtor became unable to meet all of its commitments, most significantly the agreement with the

18  IRS.

19      8.      The principal cause of the chapter 11 filing was the recordation of an IRS tax lien, a

20  copy of which is attached hereto as Exhibit 4.  Upon the filing of the tax lien, Crestmark ceased

21  making advances to NIPI.  Thus, NIPI required chapter 11 relief in order to continue operations.

22      9.      In the last two (2) months, the Debtor has reduced its administrative staffing by six

23  (6) persons leaving a core of seven (7) administrative personnel.  The Debtor has also sublet 50%

24  of its corporate office space to further reduce overhead.  Mr. Barsam, Debtor's CEO, has deferred

25  approximately $100,000 of salary and bonus payments to further support operations.  Other board

26  members have also reduced salary levels to assist the Debtor in continuing operations.

27      10.      The Debtor's assets are summarized in its current balance sheet a true and correct

28  copy of which is attached hereto as Exhibit 5.  As set forth in Exhibit 5, the Debtor has a negative

1  cash balance.  The Debtor has receivables of approximately $293,330, most of which are security

2  for Crestmark's existing receivables financing standing at a balance of $216,237.

3        11.     The Debtor's material liabilities are as follows:

4           A.  Crestmark.  Balance due $216,237.

5           B.  Payroll tax liabilities:  IRS: $627,951 and EDD: $285,023.

6           C.  Trade debt:  $1,265,468 (some of which is disputed).

7           D.  Enhanced as collateral agent for insiders, affiliates and related parties Enhanced

8  Capital, various Markowicz trusts, Pondfield Investments, EM Investments , Jon

9  Kaiden, Andy Paul, Ephraim Barsam and David McGreavy: $4,530,177 (including

10  accrued interest).  This secured indebtedness is contractually subordinated to

11  Crestmark.

12           E.  Various other liabilities are reflected on the Exhibit 5 balance sheet.

13        12.     The Debtor does not have sufficient cash from operations to continue in business

14  without post-petition financing.  Thus, approval of the DIP Loan contained in Exhibit 2 hereto and

15  the unsecured interest free $25,000 advance from my wife is both necessary and appropriate.

16        13.     Attached hereto as Exhibit 1 is the Debtor's proposed operating budget for the

17  period through March 4, 2011 ("Budget").  I believe this Budget is true and accurate and can

18  reasonably and feasibly be accomplished based on recent operating results.  If the Debtor is able to

19  obtain financing from the DIP Lender through the DIP Loan as well as the Barsam advance, the

20  Debtor will have sufficient availability under the DIP Loan to return to profitability over a period

21  of approximately two (2) months.  A longer term budget is currently being prepared and will be

22  filed in connection with the final hearing on the Motion.

23        14.     Despite its efforts, and other than the advance from my wife, the Debtor has been

24  unable to procure other financing in the form of unsecured credit allowable under § 503(b)(1) as

25  an administrative expense, solely in exchange for the grant of an administrative expense priority

26  pursuant to § 364(c)(1) or solely in exchange for granting junior or equal priority liens.  I am

27  aware of the market for such loans, and no such loan is available under the circumstances.  I

28  negotiated the Crestmark DIP Loan and sought to reduce the cost thereof as much as possible.

15.     The Debtor's has a weekly pay period that runs one (1) week in arrears. Based on the Debtor having filed its chapter 11 petition on January 6, 2011, payroll for the December 27, 2010 through January 5, 2011 pay period is earned and constitutes a pre-petition claim for employees. A schedule reflecting non-insider and insider payroll for this prepetition period is attached hereto as Exhibit 3.

16.     As a staffing company, the Debtor must pay its employees in full in order to maintain the going concern value of its business. The Debtor believes that the failure to pay any prepetition payroll will result in a loss of employee morale and employee resignations at this critical juncture early in the chapter 11 case. The Debtor must maintain its employee relationships in order to effectively reorganize.

17.     All employees listed on Exhibit 3 continue to be employed by the Debtor. The proposed payment of prepetition payroll will not render the Debtor administratively insolvent based on the projections of future operations and based on the anticipated approval of the Crestmark and Barsam financing sought herein.

18.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 6th day of January, 2011 at Los Angeles, California.

Ephraim Barsam

# EXHIBIT 1

# NURSES IN PARTNERSHIP WEEKLY CASHFLOW REPORT

| | 7-Jan | 14-Jan | 21-Jan | 28-Jan | 4-Feb | 11-Feb | 18-Feb | 25-Feb | 4-Mar |
|---|---|---|---|---|---|---|---|---|---|
| **ACCOUNTS RECEIVABLE** | | | | | | | | | |
| Beginning Accounts Receivable | 0 | 51,978 | 103,956 | 155,934 | 207,912 | 215,154 | 222,396 | 229,638 | 236,880 |
| Estimated Sales | 51,978 | 51,978 | 51,978 | 51,978 | 59,220 | 59,220 | 59,220 | 59,220 | 63,789 |
| Cash Collections | 0 | 0 | 0 | 0 | 0 | 51,978 | 51,978 | 51,978 | 51,978 |
| **Estimated Ending Accounts receivable** | 51,978 | 103,956 | 155,934 | 207,912 | 267,132 | 222,396 | 229,638 | 236,880 | 248,691 |
| | | | | | | | | | |
| 85% Advance rate | 44,181 | 44,181 | 44,181 | 44,181 | 50,337 | 50,337 | 50,337 | 50,337 | 54,221 |
| 15% Residual (released when payment rec'd) | | | | | | 6,627 | 6,627 | 6,627 | 6,627 |
| Fees Charged to HealthTalent | 6,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Fees Charged to OfficeWorks | | | 5,750 | | | | 5,750 | | |
| Fees Charged to TGI | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 10,000 |
| Interest on DIP Financing | (71) | (141) | (212) | (283) | (363) | (444) | (450) | (450) | (450) |
| Facility and Finance fees | (1,080) | (1,080) | (1,080) | (1,080) | (1,080) | (1,080) | (1,080) | (1,080) | (1,080) |
| Temporary loan from CEO | 25,000 | 25,000 | | (5,000) | | (5,000) | 5,750 | (5,000) | |
| **Total Incoming Cash** | 62,611 | 90,460 | 71,139 | 60,319 | 71,394 | 72,940 | 83,684 | 72,934 | 79,318 |
| | | | | | | | | | |
| **CONTRACT STAFF EXPENSE** | | | | | | | | | |
| Contract staff/Payroll | 33,861 | 33,861 | 33,861 | 33,861 | 37,920 | 37,920 | 37,920 | 37,920 | 41,489 |
| Contract staff/Workers Comp | | | 5,470 | | | | 6,053 | | |
| Contract Staff Medical/Dental | | 7,500 | 7,000 | 7,500 | 7,000 | | 7,000 | | |
| Contract Staff Housing | | | | | | | | 1,200 | |
| Contract Staff Utilities | | | | 900 | | | | 410 | 335 |
| Contract Staff Travel Costs | 400 | 400 | 400 | 400 | 410 | 410 | 410 | | |
| Contract Staff Background checks | | | | 700 | | | | 800 | |
| **Contract  Staff Expense** | 34,261 | 41,761 | 46,731 | 43,361 | 45,330 | 38,330 | 51,383 | 40,330 | 41,824 |

**BRANCH OPERATIONAL EXPENSE**

| | | | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Branch Payroll | | | | | | | | | |
| Equipment Rental | | 4,464 | 1,370 | 4,464 | | 4,464 | 1,370 | 4,464 | |
| Rent | | | | | | | | | 8,000 |
| Office Expenses | 1,200 | 1,615 | | 1,615 | | 1,615 | | 1,615 | 1,615 |
| Utilities/Communications | 500 | | | 1,200 | 500 | | | | |
| **Total Branch Operational Expense** | **1,700** | **6,079** | **1,370** | **7,279** | **500** | **6,079** | **1,370** | **6,079** | **500** |

**CORPORATE EXPENSE**

| | | | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| Staff Salaries | | 20,000 | | 20,000 | 20,000 | 20,000 | | 20,000 | |
| Medical/Dental Insurance | | | | 3,000 | | | | 3,000 | |
| Rent | | | | | | | | 8,000 | |
| Professional and Gen Insurance | | 5,000 | | | | | 5,000 | | |
| Communications | | 1,700 | | | | 1,700 | | | |
| Postage/Other | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Stationary | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Automobile/Gas | 850 | 250 | 250 | 2,200 | 850 | 250 | 250 | 2,200 | 250 |
| Computer Maintenance | 2,500 | | | | | | | | |
| Bank Charges | | | | 1,500 | 1,500 | | | | |
| Tax expenses Gen | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Legal | 10,000 | | | | | | | | 25,000 |
| **Total Corporate Expense** | **14,050** | **27,650** | **950** | **27,400** | **22,050** | **22,650** | **5,950** | **33,900** | **25,950** |
| **TOTAL EXPENSE** | **43,524** | **46,409** | **52,753** | **45,609** | **45,830** | **49,440** | **48,101** | **47,840** | **60,711** |
| | | | | | | | | | |
| **Net Cash Increase/(Decrease) for period** | **21,744** | **(1,125)** | **29,981** | **(69)** | **3,513** | **(11,772)** | **17,088** | **8,719** | **1,899** |
| **Cash at beginning of period** | **48,234** | **49,360** | **19,379** | **19,448** | **15,934** | **27,706** | **10,619** | **1,899** | **0** |
| **Cash at end of period** | **69,978** | **48,234** | **49,360** | **19,379** | **19,448** | **15,934** | **27,706** | **10,619** | **1,899** |

# EXHIBIT 2

**Lewis R. Landau** (CA Bar No. 143391)
**Attorney-at-Law**
23564 Calabasas Road, Suite 104
Calabasas, California 91302
Voice and Fax: (888) 822-4340
Email:  Lew@Landaunet.com

[Proposed] Attorney for Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No.: 1:11-bk-10200 MT_____ |
| Nurses in Partnership, Inc., | Chapter 11 |
| Debtor. | **INTERIM ORDER APPROVING POST-PETITION FINANCING AGREEMENT, (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT, AND (C) MODIFYING AUTOMATIC STAY, PURSUANT TO SECTIONS 362 AND 364 OF THE BANKRUPTCY CODE** |
| | *Hearing Date and Time to be Set*<br>*Pursuant to Court Order* |
| Debtor's EIN: 35-2182319<br>Address:  22144 Clarendon Street, Suite 100<br>Woodland Hills, CA  91367 | Date:         January ___, 2011 (*to be set*)<br>Time:         _         (*to be set*)<br>Place:       Courtroom 302; Judge Tighe_____<br>United States Bankruptcy Court<br>21041 Burbank Blvd.; 3rd Floor<br>Woodland Hills, California  91367 |

THIS MATTER, having come regularly before the undersigned upon the motion of Nurses in Partnership Inc. (the "Debtor") for approval of post-petition financing of the Debtor by Crestmark Bank ("Secured Party") and the granting of security interests under Section 364 of the Bankruptcy Code (the "Motion"), and it appearing that the immediate entry of this Order is essential to the continued orderly operation of the Debtor's business and is in the best interest of the Debtor and the Debtor's estate, the following findings of fact are made by the Court:

# I. FINDINGS OF FACT

1. On January 6, 2011 (the "Petition Date") the Debtor filed its voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

2. The Debtor and Secured Party are parties to the loan documents attached hereto as Exhibit B (collectively, the "Pre-Petition Agreement"), pursuant to which the Debtor obtained financial accommodations from the Secured Party.

3. The Pre-Petition Agreement provides for advances by Secured Party to the Debtor, so long as such advances do not cause the ratio of the Debtor's obligations to Secured Party to the value (as determined in the Pre-Petition Agreement) of the Debtor's eligible (as determined in the Pre-Petition Agreement) accounts to exceed that set forth in the Pre-Petition Agreement (the "Formula").

4. As of the Petition Date, the Debtor was indebted to the Secured Party in the amount of at least $216,237.79 (the "Pre-Petition Obligation") secured by the collateral described in the Pre-Petition Agreement.

5. The Debtor has offered to assign its accounts to Secured Party under the Pre-Petition Agreement.

6. The Secured Party has agreed to continue to provide working capital to the Debtor in accordance with the Pre-Petition Agreement, as amended by a First Amendment to Demand Promissory Note attached hereto as Exhibit A (the "Amendment").

7. The Debtor, notwithstanding its efforts to do so, is unable to obtain unsecured credit allowable under 11 U.S.C. Section 503(b)(1) as an administrative expense, or other than pursuant to 11 U.S.C. Section 364(c)(2) and (3), and the Debtor is unable to obtain credit on terms equal to or more favorable than those proposed by Secured Party.

8. Secured Party has agreed to consider providing working capital to the Debtor in accordance with the Pre-Petition Agreement in good faith, within the meaning of 11 U.S.C. Section 364(e), and all interested parties were either notified of the Motion, as evidenced by the affidavit of service, or were present at this Court's hearing on the Motion.

9. Good cause exists for approval of the Debtor's agreement to the financing by Secured Party under the terms of the Pre-Petition Agreement, and the entry of this Order will minimize disruption of the Debtor as a "going concern" and is in the best interest of the Debtor, its creditors, and its estate. The terms upon which the Debtor is authorized to utilize cash advances are determined as fair under the circumstances.

10. The Debtor has provided written notice of the filing of the Motion to Secured Party, the United States Trustee, any Official Creditors' Committee appointed in this Case and its counsel, the twenty largest unsecured creditors of the Debtor, all of the Debtor's secured creditors, the Internal Revenue Service, and all parties who filed requests for notice as evidenced by the affidavit of service filed by the Debtor's counsel with this Court, which notice this Court finds to be appropriate and adequate under Federal Rules of Bankruptcy Procedure 2002 and 4001, and as required by Section 364 of the Bankruptcy Code.

11. The Debtor admits, without prejudice to the rights of an Official Committee of Unsecured Creditors and third parties to challenge same to the extent set forth below, that as of the Petition Date, in accordance with the Pre-Petition Agreement, the Debtor was indebted to the Secured Party, without defense, counterclaim, recoupment or setoff, in the aggregate amount of at least the Pre-Petition Obligation secured by a valid, enforceable and properly perfected first priority lien in the collateral described therein.

12. The Pre-Petition Agreement with Secured Party provides a vital source of working capital for the Debtor, is in the best interests of the Debtor and its estate, and is necessary to avoid immediate and irreparable harm.

## II. ORDER

Based on the foregoing Findings, it is now therefore ORDERED as follows:

1. All capitalized terms used in this Order, not otherwise defined herein and unless otherwise indicated, shall have the meaning given them in the Pre-Petition Agreement.

2. The Debtor is authorized, effective immediately, to assign any and all pre-petition or post-petition accounts to the Secured Party pursuant to Bankruptcy Code Section 363, pursuant to the terms of the Pre-Petition Agreement and Amendment, and to execute all documents and take all

actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

3. The Debtor is authorized to ratify, and is deemed to have so ratified, the Pre-Petition Agreement.

4. The Debtor is authorized and empowered to (i) assume the Pre-Petition Agreement, to enter into the Amendment, and (ii) incur secured indebtedness to Secured Party pursuant to this Order and the Pre-Petition Agreement in such amounts as needed in the ordinary course of its business and not for any purpose prohibited by law.  Debtor's use of the proceeds of such indebtedness shall not affect the rights of Secured Party hereunder.  Any transaction between the Debtor and Secured Party which Secured Party reasonably understands to be intended to be under the Pre-Petition Agreement shall represent such assumption of the Pre-Petition Agreement by Debtor.

5. Secured Party and Debtor may amend, modify, supplement, waive the provisions of and/or extend the term of the agreements contemplated herein without further order of the Court provided that same does not materially alter the provisions thereof.

6. Pursuant to Section 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Debtor may grant to Secured Party a security interest in the collateral as set forth in the Pre-Petition Agreement effective as of the date of the filing of the Bankruptcy Case ("Collateral") as collateral for all present and future obligations of the Debtor to Secured Party, including Secured Party's reasonable attorneys' fees and expenses incurred in connection with the negotiation documentation, closing and enforcement of the Pre-Petition Agreement and the protection of Secured Party's rights in this Bankruptcy Case (the "Obligations").  The Secured Party's security interest shall be senior to the claim of any entity now or hereafter claiming an interest in the Collateral.  The Secured Party may but need not file an Initial Financing Statement under the Uniform Commercial Code to perfect its security interest in the Collateral.

7. In addition to the fees, costs, charges and expenses authorized under the Pre-Petition Agreement, the Debtor shall pay to the Secured Party on demand without application to the Court (but subject to review by the Official Committee of Unsecured Creditors or the U.S. Trustee,) Secured Party's reasonable attorneys fees and other professional fees arising from or related to the

transactions contemplated herein, including without limitation the negotiating, closing, documenting, and obtaining Court approval thereof, the enforcement of Secured Party's rights against Debtor.

8. The Obligations shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code, which shall be deemed allowed, without any further filing by Secured Party, and which shall have priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to a carve-out for fees and expenses of professionals not exceeding $10,000.

9. To the extent that the Debtor may become indebted to any governmental entity, whether for payroll or other taxes or otherwise, and said governmental entity is also an account debtor of the Debtor, the governmental entity's right of setoff, defense , counterclaim or recoupment, if any, shall be subordinate to the rights of Secured Party with respect to accounts owing to the Debtor which comprise a portion of the Collateral, and the governmental entity shall pay the amount owing on the account free of any claim of setoff or recoupment.

10. For administrative convenience, Secured Party may record the pre-petition transactions and the post-petition transactions arising under the Pre-Petition Agreement in one account, and apply payments on a "first in, first out" basis.

11. The liens granted to Secured Party herein are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of Secured Party, including but not limited to, the filing or recording of Uniform Commercial Code financing statements; provided, however, that in the event Secured Party does make such a filing or recordation, the Debtor shall execute all documents required by Secured Party to do so.

12. Nothing in the Pre-Petition Agreement, or in any of the documents executed in connection therewith or this Order, shall require Secured Party to provide financial accommodations to the Debtor, such being in the sole discretion of Secured Party.

13. Secured Party is hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Order by this Court.

14. The Debtor shall comply with all provisions of the Pre-Petition Agreement.

15. To the extent that any provision of the Pre-Petition Agreement shall cause the Debtor to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions are waived by Secured Party.

16. The Debtor shall not grant to any party any interest in the Collateral or priority in payment prior to or equal with the lien or priority in payment hereby being accorded to Secured Party.

17. The entry of this Order and execution, delivery, and performance under the Pre-Petition Agreement, or under any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of Secured Party at law, in equity or otherwise, including, but not limited to, any right of Secured Party to request and to obtain relief under the Bankruptcy Code.

18. The automatic stay provisions of 11 U.S.C. Section 362 are lifted and terminated to enable Secured Party to implement the provisions of this Order and otherwise thereby to permit Secured Party to demand and receive collections on account of the Collateral, and to apply those collections to the Obligations.  Notwithstanding the foregoing, the Secured Party is not hereby granted relief from the automatic stay to enforce any remedies against the Debtor that may be afforded under the Pre-Petition Agreement.  In the event a Default occurs under the terms of the Pre-Petition Agreement, Secured Party shall have a right to notice an expedited hearing before this Court seeking such relief as may be deemed appropriate upon three days' notice to counsel for the Debtor; (ii) counsel for any statutory committee appointed herein or, alternatively, the twenty largest unsecured creditors; (iii) the Office of the U.S. Trustee; and (iv) the United States Attorneys Office.

19. The Debtor may not use any of Secured Party's "cash collateral" as such term is defined in the Bankruptcy Code.  For the purposes of this Order, "cash collateral" shall not include funds advanced by the Secured Party to the Debtor.  Accordingly any cash collateral heretofore received by the Debtor shall be immediately paid to Secured Party; and hereafter coming into the Debtor's possession shall be paid to Secured Party immediately upon the Debtor's receipt.

20. The Debtor will not propose a Plan of Reorganization that requires Secured Party to accept less than the full amount that the Debtor owes to Secured Party as of the date of commencement of this case.

21. The Debtor will not seek to surcharge the Secured Party or its collateral with any expenses of the type described in Section 506(c) or 552(b) of the Bankruptcy Code unless it obtained Secured Party's prior written consent to the incurrence of such expenses.

22. The Pre-Petition Agreement is enforceable according to its terms and nothing contained therein is unlawful, unenforceable or violative of any usury or similar statute.

23. An event of default under this Order ("Default") shall include the following:

a. the Debtor's failure to perform or comply with any of the terms, conditions, or covenants of this Order;

b. The Debtor's failure to perform or comply with any of the terms, conditions, or covenants of the Pre-Petition Agreement;

c. A deterioration in the Formula from what it was on the Petition Date;

d. The termination of this Order by its own terms, operation of law or court order;

e. The dismissal of this Bankruptcy Case;

f. The appointment of a trustee under the Bankruptcy Code;

g. The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code;

24. Upon the occurrence of a Default, Secured Party shall provide the Debtor written notice of such Default to the Debtor and counsel for the Debtor. If the Default is a type that is not curable, or is curable by the Debtor and the Debtor fails to cure the Default within 24 hours from the time of service of such notice of the Default:

a. the Debtor shall not seek authority to use any Cash Collateral;

b. the Debtor shall hold and segregate all Cash Collateral in trust for Secured Party and

c. Secured Party shall be entitled to an expedited hearing on a motion for immediate relief from the automatic stay under Section 362 within not less than two (2) Court days from the date of the Default, subject to the Court's calendar (the "Stay Relief Motion"). The only issue for

consideration by the Court with respect to the Stay Relief Motion is whether a Default has occurred.

25. Notwithstanding anything to the contrary contained herein, the proceeds of any advance from Secured Party, shall not be used either: (a) in connection with the investigation, assertion, commencement, or continuation of any action or claim against Secured Party or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of any rights or claims of the Secured Party.

26. This Order is without prejudice to Secured Party's rights to pursue any and all rights and remedies under the Bankruptcy Code, the Agreement, and any other applicable agreement or law, including without limitation to seek relief from the automatic stay and/or to seek adequate protection with respect to matters not covered by this Order, to seek an injunction, and/or to object to applications for allowance and/or payment of compensation of professionals employed by the Debtor or its estate.

27. The obligations and indebtedness owed under the Pre-Petition Agreement are valid and indefeasible obligations of the Debtor and its estate, in accordance with their terms; and the liens and security interests in favor of Secured Party with respect to the Collateral are valid, enforceable, perfected, and unavoidable under the Bankruptcy Code, including Section 552, and any other applicable law.

**IT IS SO ORDERED.**


Dated: _____      _____
                              **MAUREEN A. TIGHE**
                              **UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT A

**FIRST AMENDMENT**
**TO**
**DEMAND PROMISSORY NOTE**

This First Amendment to Demand Promissory Note (the "Amendment") is made this 6th day of January, 2011, by and between **CRESTMARK BANK**, a Michigan banking corporation, whose address is 5480 Corporate Drive, Suite 350, Troy, Michigan  48098 ("Crestmark"), and **NURSES IN PARTNERSHIP, INC**., debtor in possession, a Delaware corporation (the "Debtor"), **HEALTHTALENT INC**., a Delaware corporation ("HT") and **TECHGROUP, INC**., a Washington corporation ("TG") (the Debtor, HT and TG are collectively referred to as the "Borrower").

**BACKGROUND**:

NURSES IN PARTNERSHIP, INC., a Delaware corporation ("Nurses"), HT and TG have entered into a $2,000,000.00 Demand Promissory Note dated October 8, 2009 in favor of Crestmark (the "Note").

The Debtor has filed a petition for relief under Chapter 11 of the Bankruptcy Code, and the Debtor has assumed all obligations of Nurses owing to Crestmark, including, without limitation, all obligations under the Note.

Borrower and Crestmark desire to modify and amend certain terms, conditions, covenants and obligations contained in the Note

Accordingly**,** the parties agree as follows:

1.      **INCORPORATION BY REFERENCE:**

All definitions and terms used in the Note are hereby incorporated in this Amendment.

2.      **AMENDMENT AND MODIFICATION TO NOTE:**

A.      The third (3rd) paragraph of the Note is deleted in its entirety, and the following is substituted in its place:

"Interest will be charged on the greater of the outstanding daily principal balance of this Note or the Minimum Loan Balance as set forth in the Loan Agreement, on a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment.   The interest rate will be a rate which is equal to: (a) as to the Borrowers Healthtalent Inc., and TechGroup, Inc, 3.00 percentage points in excess of that rate shown in the Wall Street Journal as the prime rate (the "HTTG Effective Rate"); and (b) as to the Borrower Nurses In Partnership, Inc, debtor-in-possession, 5.00 percentage points in excess of that rate shown in the Wall Street Journal as the prime rate (the "Nurses Effective Rate").   Interest on this Note will change with each change in the prime rate so published.   If at any time Crestmark

either abandons the use of the Wall Street Journal prime rate or the Wall Street Journal prime rate is no longer published, then Crestmark will establish a similar replacement rate in its sole discretion.  Notwithstanding the foregoing, at no time will the HTTG Effective Rate be less than 6.25% percent per annum, and at no time will the Nurses Effective Rate be less than 8.25%."

**2.     EXPENSES:**

In consideration of the extension of the loan to the Debtor and the execution of this Amendment, Debtor will pay Crestmark a fee of $7,500.00, which fee is fully earned as of the date hereof, and non-refundable.  Borrower will also promptly pay all expenses, fees and costs incurred by Crestmark with respect to the preparation, execution, and delivery of this Amendment, and all other documents contemplated herewith, and in connection with eh providing of the debtor in possession financing, including, without limitation, reasonable attorneys' fees.

**3.     NO WAIVER:**

Borrower acknowledges that the execution of this Amendment does not constitute a waiver or cure of any Default, whether matured or otherwise, if any, that previously existed or now exists under the Note, Loan Agreement or any Collateral Document.  By execution of this Agreement, Crestmark will not be deemed to have waived any of its rights or remedies under the Loan Agreement or any Collateral Document.

**4.     SURVIVAL, REAFFIRMATION, AND NO DEFENSES:**

Each undersigned Borrower and Guarantor agrees, in all capacities in which the signatory has executed the Loan Agreement or any of the Collateral Documents, as follows:

A.     That, except as herein expressly modified or amended, all terms, conditions, covenants, representations and warranties contained in the Loan Agreement and the documents among Crestmark, the Borrower and Nurses (collectively the Collateral Documents") are true and correct, continue to be satisfied in all respects and are legal, valid and binding obligations.

B.     That payment of the Indebtedness is the valid obligation of Borrower and, as of the date hereof, Borrower has absolutely no defenses, claims, rights of set-off or counterclaims against Crestmark or the payment of the Indebtedness.  This Amendment shall not impair the rights, remedies and Collateral given in the Loan Agreement and the Collateral Documents.

C.     That the liability of the undersigned howsoever arising or provided for in the Loan Agreement and the Collateral Documents is hereby reaffirmed.

2

**5.      <u>NO ORAL MODIFICATION</u>:**

   This Amendment may only be altered or modified by written instrument duly executed by Borrower and Crestmark.


The parties hereto have executed this Amendment the day and year first appearing above.

BORROWER:

NURSES IN PARTNERSHIP, INC., debtor-in-possession,
a Delaware corporation


By:_____

_____
Its: President

Borrowers Address:

_____

HEALTHTALENT INC., a Delaware corporation


By:_____

_____
Its: President

Borrowers Address:

_____

3

TECHGROUP, INC., a Washington corporation


By:_____

_____
           Its: President


Borrowers Address:

_____


**CRESTMARK:**

Crestmark Bank, a Michigan banking corporation


By:    _____
Its:    _____

4

**EXHIBIT B**

## DEMAND PROMISSORY NOTE

**Principal Amount $2,000,000**

**Due: On Demand**



Dated: October 8, 2009

    This Demand Promissory Note ("Note") is made by the Borrower who has signed this Note. The Borrower, jointly and severally, promises to pay to the order of **CRESTMARK BANK**, a Michigan banking corporation ("Crestmark"), on Demand, and if not sooner demanded upon the expiration of the Term or any renewal Term, at its offices located at 5480 Corporate Drive, Suite 350, Troy, Michigan 48098 or at such other place as Crestmark or the person that then holds this Note designates in writing, the principal amount set forth above or such lesser or greater amount as may then be due. In addition to the principal amount, the Borrower must also pay interest, fees and expenses. All payments that are made must be made in lawful money of the United States of America in immediately available funds. Borrower does not have any right to offset, deduct, or counterclaim from the amount due.

    This Note is one of the Loan Documents described in a Loan and Security Agreement ("Loan Agreement") of even date between Borrower and Crestmark. Any capitalized terms used in this Note, if not specifically defined in this Note, will have the meanings set forth in the Loan Agreement.

    Interest will be charged on the greater of the outstanding daily principal balance of this Note or the Minimum Loan Balance as set forth in the Loan Agreement, on a year of 360 days with interest being charged for each day the principal amount is outstanding including the date of actual payment. The interest rate will be a rate which is equal to 3.00 percentage points in excess of that rate shown in the Wall Street Journal as the prime rate (the "Effective Rate"). Interest on this Note will change with each change in the prime rate so published. If at any time Crestmark either abandons the use of the Wall Street Journal prime rate or the Wall Street Journal prime rate is no longer published, then Crestmark will establish a similar replacement rate in its sole discretion. Notwithstanding the foregoing, at no time will the Effective Rate be less than 6.25% percent per annum.

    Borrower must pay interest on the principal amount which is outstanding each month in arrears commencing on the first day of the month following the funding of the transaction, and continuing on the first day of each month thereafter until Demand or until the Indebtedness is fully paid. If the Loan Agreement so provides, interest will also be payable at the same rate on all other sums constituting the Indebtedness. If any payment is due on a day which Crestmark is not open for business, then payments will be made on the next business day. Payments will be applied in the manner provided in the Loan Agreement. If Borrower at any time pays less than the amount then due, Crestmark may accept such payment, but (i) THE FAILURE OF BORROWER TO COMPLY WITH THE PROVISIONS OF THE LOAN AGREEMENT OR (ii) FAILURE TO PAY THE INDEBTEDNESS OWED TO CRESTMARK FOLLOWING DEMAND WILL PERMIT CRESTMARK TO CHARGE THE EXTRA RATE. The "Extra Rate" shall mean the Wall Street Journal prime rate plus eight (8%) percent, but in any event not less than 18% per annum.

    Should Borrower make any payment by mail, the payment must be actually received by Crestmark before the payment is credited. Borrower assumes all risk resulting from non-delivery or delay, in delivery of any payment no matter how the payment is delivered.

    Crestmark will not charge interest on this Note in excess of the maximum rate permitted by law. Any interest payment in excess of such rate will be applied to the outstanding principal balance of the Indebtedness.

    If Crestmark delays in exercising any of its rights, or remedies under this Note, such delay will not affect the right or remedy.

    Borrower specifically acknowledges that this is a Demand Note which means Crestmark may call it at any time with or without reason, and upon Demand the Note and the Indebtedness must be paid in full. If not paid in full, the Extra Rate of interest will apply.

Borrower waives any obligation of Crestmark to present this Note for payment or to give any notice of nonpayment or notice of protest and any other notices of any kind.

The Loan Agreement and the Loan Documents as defined therein contain additional terms and Borrower understands that such terms are all incorporated herein.

**BORROWER:**

NURSES IN PARTNERSHIP, INC.

a Delaware corporation

Borrowers Address: 29219 Canwood St, # 220
Agoura Hills, CA 91301

By: _____

Its: President

HEALTHTALENT INC.

a Delaware corporation

Borrowers Address: 29219 Canwood St, # 220
Agoura Hills, CA 91301

By: _____

Its: President

TECHGROUP, INC.,

a Washington corporation

Borrowers Address: 2ULL WEST MAIN
SPOKANE WA 99201

By: _____

Its: President

1453462.02

2

## LOAN AND SECURITY AGREEMENT
("Agreement")

This document dated October _8_ , 2009, is an agreement between **CRESTMARK BANK**, a Michigan banking corporation ("Crestmark"), and **NURSES IN PARTNERSHIP, INC.**, a Delaware corporation, **HEALTHTALENT INC.**, a Delaware corporation and **TECHGROUP, INC.**, a Washington corporation (collectively "Borrower"). In this Agreement, Crestmark and the Borrower are collectively the "Parties". Any person who guaranties the obligations of Borrower (each a "Guarantor") is required to sign this Agreement. The Parties have the addresses shown on the Schedule which is attached to this Agreement. These are the addresses of the Parties for all purposes and may be changed by one party giving notice to the other party in writing of the new address.

    **1.**   **PURPOSE**. The purpose of this Agreement is to set out the terms for the loan from Crestmark to the Borrower detailed in the Schedule ("Loan"). The Schedule is part of this Agreement. The note to be signed by the Borrower, any guaranty(s), and any other documents now or hereafter signed by any of the Parties in connection with this Agreement, the Loan or any document issued by Crestmark or the bank holding the lockbox ("Lockbox Bank") are also all part of this Agreement. All of the documents together are referred to collectively as the "Loan Documents".

    **2.**   **DISCRETION**. Whether Crestmark makes an advance to or for Borrower's benefit under the Loan Documents is in Crestmark's sole discretion. Any disbursement of money or advance of credit by Crestmark, including but not limited to amounts advanced for the payment of interest, fees, expenses and amounts necessary to protect, maintain and preserve Crestmark's Collateral under the Loan Documents ("Protective Disbursements"), is referred to collectively as an "Advance". If an Advance is made, it will be made in accordance with the Advance Formula described in this Agreement and detailed in the Schedule. Crestmark may choose to make Protective Disbursement in excess of the Maximum Amount or Advance Formula (each as hereafter defined) in its sole discretion. Each time Crestmark makes an "Advance", including a "Protective Disbursement", the Advance will be debited against an account in the Borrower's name on Crestmark's books ("Loan Account"), and each payment will be credited against the Loan Account in the manner described in this Agreement.

    **3.**   **BORROWER'S OBLIGATIONS; LOAN**.

    **A.**   The Borrower must repay all Advances with respect to the Loan with interest, which is due monthly as specified in the note, along with all other fees and expenses of Crestmark set forth herein or in the Schedule. The Borrower must also comply with its representations, promises, covenants and reporting requirements set forth in this Agreement, in the Schedule and in the other Loan Documents. Borrower's failure to do any of the foregoing is known as a default ("Default").

    **B.**   The total amount Borrower owes to Crestmark will be the aggregate of the Advances made by Crestmark, including Protective Disbursements, the expenses and fees shown on the Schedule, any and all costs incurred by Crestmark (including its actual attorney's fees), and interest at the rate shown in the note on all amounts Advanced. All of these amounts together are referred to as the "Indebtedness".

    **C.**   Borrower understands and agrees that the entire Indebtedness is repayable on the demand of Crestmark.

    **D.**   The interest rate may be changed to the Extra Rate described in the note in Crestmark's discretion if the Borrower is in Default or if the Borrower fails to pay the Indebtedness on demand.

    **E.**   The total Indebtedness will not, at any time, exceed the maximum amount set forth on the Schedule ("Maximum Amount"), and the Borrower understands that if at any time it should owe more to Crestmark than the Maximum Amount it must repay that amount immediately, whether or not demand to repay the whole of the Indebtedness has been made. Further, Protective Disbursements must be immediately repaid whether or not the Maximum Amount has been exceeded.

    **F.**   Advances with respect to the Loan may be measured against a percentage of Eligible Accounts, Eligible Inventory and/or a Borrowing Base typically based on a value attributed to equipment or real estate

1504086.02

("Advance Formula") depending on the agreement of the Parties as reflected in the Schedule. The percentage and the definition of which accounts or inventory are "Eligible" are found in the Schedule. If applicable, the Borrowing Base will also be stated in the Schedule. The Indebtedness may not exceed the lesser of the Maximum Amount or the Advance Formula. There may be availability for an Advance ("Availability") as long as the then outstanding Indebtedness is less than the lower of the Maximum Amount or the Advance Formula.

## 4.    SECURITY INTEREST.

A.    Before Crestmark makes any Advance to the Borrower, the Borrower must give Crestmark security for repayment of the Indebtedness. This security is known as a "Security Interest". Borrower, by signing this Agreement, grants to Crestmark a Security Interest in all of its accounts, goods, inventory, equipment, chattel paper, instruments, investment property, specifically identified commercial tort claims, documents, deposit accounts, letter of credit rights, general intangibles and supporting obligations for any of the foregoing (the "Collateral"), to secure repayment of the Indebtedness. The Collateral also includes all monies on deposit with Crestmark, or on deposit in the Lockbox Account which is described later. If any of the foregoing is at any time disposed of or sold, Crestmark also has a Security Interest in all of the proceeds of any of the foregoing.

B.    Crestmark has the right to perfect its Security Interest by filing what is known as a financing statement or by taking possession of certain Collateral. In connection with the Security Interest, Borrower gives Crestmark all of the rights of a secured creditor under the Uniform Commercial Code (the "UCC"). All expenses of Crestmark relating to the Security Interest are part of the Indebtedness.

C.    In connection with the Security Interest, Borrower must notify all persons who owe it on account ("Account Debtor") of the Crestmark Security Interest on a form approved by Crestmark and all Account Debtors must be instructed to make all payments on the account, whether by credit cards, check or electronic transfer, to the Lockbox Account, or as instructed by Crestmark in its sole discretion.

D.    The Security Interest gives Crestmark rights with respect to the Collateral and the Security Interest and this Agreement imposes duties upon the Borrower which relate to the Collateral. Some of the rights and duties are: (i) the right of Crestmark at any time to notify any persons who may hold any part of the Collateral, such as Account Debtors, of Crestmark's Security Interest. Borrower should understand that Crestmark will verify accounts with the Account Debtors; (ii) the Borrower must cooperate with Crestmark in obtaining control of any Collateral in the possession of third persons, particularly Collateral consisting of deposit accounts, investment property, letter of credit rights or other collateral which is evidenced by electronic entries; (iii) except for the right of Borrower to sell its inventory in the ordinary course of business, the Borrower agrees not to sell or transfer any of its Collateral or grant any other Security Interest in the Collateral, except as Crestmark may specifically agree to in writing. Borrower remains liable to perform all of its obligations with respect to the Collateral such as the recognition of any warranties in inventory sold and Crestmark is under no responsibility to perform any of the obligations of the Borrower; and (iv) Borrower must notify Crestmark immediately if it knows that any Account Debtor disputes an account.

## 5.    LOAN ADVANCES.

A.    Advances with respect to the Loan are always discretionary with Crestmark.   In connection with any request for an Advance, if the request is based upon specific Eligible Accounts, the Borrower must also furnish to Crestmark at the same time invoices, credit memos, purchase orders, evidence of delivery, proof of shipment, timesheets or any other documents Crestmark requests, in its sole discretion, with respect to the accounts that Borrower is tendering to Crestmark to support the Advance ("Account Documents"). At the request of Crestmark Borrower will provide a Borrowing Certificate in form approved by Crestmark before the Advance is made. Crestmark will endeavor to provide the requested funds by 4:00 p.m. Eastern Standard Time on the date that it receives the request so long as the complete package of information for the request has been received by 10:30 a.m. All requests for funding will be subject to Crestmark's then standard fees for electronic funds transfer, wire transfers and check services.

B.    All documents related to the accounts must be marked by Borrower to show assignment to Crestmark and the Borrower must notify each Account Debtor by mail, in accordance with a form approved by Crestmark that the account has been assigned to Crestmark and that all payments on the account whether made by mail or electronically or otherwise must be made payable to the Borrower at the address provided in the letter, which is the

2

Lockbox Account. The address for payments will be the Lockbox Bank specified in the Schedule. All expenses for notification of each Account Debtor will be paid by the Borrower. All expenses plus any applicable administration fees of the Lockbox will be paid by Borrower. All accounts specifically submitted to Crestmark with Account Documents for which an Advance is made will be known as Crestmark Accounts (the "Crestmark Accounts").

C.    Borrower agrees that Crestmark has the right to determine, in its sole discretion, whether any account is an Eligible Account, or which inventory constitutes Eligible Inventory, but no account or inventory will be eligible for Advance unless the eligibility requirements set forth in the Schedule are met.

6.    **RESERVES**.  If Crestmark believes in its sole discretion that the prospect for repayment of the Indebtedness is impaired or that its Collateral margin is insufficient, Crestmark may establish cash reserves and credit balances to protect its interests and the repayment of the Indebtedness. Money in the reserve account will not earn interest for Borrower, and Crestmark may apply the funds in the Reserve to reduce the Indebtedness at any time Crestmark elects.

7.    **FEES AND EXPENSES**.  In connection with the Loan there are several types of fees that may be charged. The fees to be charged with respect to the Loan are shown on the Schedule. In addition, all expenses of every kind incurred by Crestmark in connection with the Loan, or any Advance or for collection of the Indebtedness, or inspection and examination are to be paid by Borrower, including but not limited to Crestmark's actual attorney's fees for outside counsel, postage and UCC search charges.

8.    **MINIMUM BALANCE**.  Borrower agrees that it will maintain a minimum Loan balance in the amount shown on the Schedule for the period shown and Borrower understands that the Interest Rate and Maintenance Fee has been calculated on that minimum loan balance.

9.    **LOAN ACCOUNT**.  All of the Indebtedness which is owed by Borrower will be shown in the Loan Account and Borrower will receive a monthly interest statement. The statement is binding on Borrower unless Borrower provides a written objection to Crestmark that is actually received by Crestmark within thirty (30) days of the time the Loan Account statement is mailed.

10.    **CALCULATION OF INDEBTEDNESS**.  Each time an Advance is made, the amount of the Indebtedness will be increased by the amount of the Advance. Three (3) business days after checks or other credit instruments are deposited in the Lockbox Account, Crestmark will credit the Loan Account with the net amount of cash actually received and will no longer charge Interest and Maintenance Fee upon such amount after the expiration of the clearance days set forth above. Also, on the date the deposit is made the Borrower will receive immediate credit on the funds deposited in determining Availability. Should a check or other credit instrument not be collected after the Borrower has been given credit, then the credit will be reversed. The Borrower should understand, however, that if Crestmark has some question about the collectability of funds it does not have to give credit until the funds are actually collected and in such event if the deposit is held for a longer period of time then the Maintenance Fee will still be payable.

11.    **PAYMENTS**.  When Crestmark receives a payment from an Account Debtor, it will try to apply it against the appropriate Debtor. If it is not clear which accounts the payment is suppose to be applied against, Crestmark will contact the Borrower for assistance. Unless there is clear error, the application of repayment by Crestmark is final. Any payments received by Crestmark if made with respect to a Crestmark Account will be applied to the Advance on that account, then to the Maintenance Fee for that account, then to the interest on that account, then to expenses, then either to the reserve or to Borrower in the form of availability.

12.    **LOCKBOX.**  Borrower will direct all Account Debtors and any other person or party that is liable to the Borrower (collectively a "Debtor") to mail or send all payments due Borrower to the account ("Lockbox Account") at the bank identified on the Schedule as the Lockbox Bank. If notwithstanding the notice to the Debtors Borrower receives any funds from a Debtor, including but not limited to any cash, checks, drafts or wire transfers from the collection, enforcement, sale or other disposition of the Collateral whether derived in the ordinary course of business or not, or if Borrower receives any proceeds of insurance, tax refunds or any and all other funds of any kind, Borrower must hold such funds in trust for Crestmark, shall not mix such funds received with any other funds, and shall immediately deposit such funds in the Lockbox Account in the form received. That means if the funds are received by mail, the checks will be sent to the Lockbox Account, and if the funds are received electronically, the funds will be transferred to the Lockbox Account electronically. Crestmark will have sole control over the Lockbox

3

Account. The Lockbox Bank will process all deposits and Borrower has no right to the Lockbox Account, it belongs to Crestmark. Borrower gives Crestmark an irrevocable Power of Attorney which is coupled with an interest to endorse all items delivered to the Lockbox Account with Borrower's name. Crestmark is the owner of all deposits in the Lockbox Account, and has no duty as to collection or protection of funds as long as it is not grossly negligent or commits actual fraud.

13.    **REPRESENTATIONS**.  Borrower makes the following statements (representations) to Crestmark and such statements must be true at all times until the Indebtedness is paid in full.  If Borrower learns that a statement once made is no longer true, it has the duty to immediately notify Crestmark in writing:

A.    Borrower is in good standing under the laws of the state shown on the Schedule , has the power and authority to enter into this Agreement, and the persons signing this Agreement and all persons who sign any documents with Crestmark have the appropriate authority.  Borrower's identification numbers and addresses are as shown on the Schedule.

B.    Borrower's entry into the Loan Documents do not violate any agreement which Borrower has or which binds Borrower.

C.    The Loan Documents are fully enforceable against Borrower.

D.    There is no litigation pending or threatened against Borrower and Borrower is not in default of any order or judgment of any court or any governmental agency of any kind, except as set forth on Exhibit "13" attached hereto.

E.    The financial information furnished to Crestmark has been prepared in accordance with generally accepted accounting principles, all financial statements are true, and any projections of the business operations of Borrower that have been given or will be given to Crestmark in the future will be based upon Borrower's reasonable assumptions and estimates.

F.    The Borrower is the owner of all of the Collateral and there are no other liens or claims against the Collateral, except the Security Interest of Crestmark or as shown on the Schedule.

G.    All of the Collateral is personal property and none of the Collateral will be affixed to real estate.

H.    Borrower has filed and will file all federal, state, local and foreign tax returns that it is required to file and has paid and will pay all taxes and all other governmental charges as they become due, except as set forth on Exhibit "13" attached hereto, and for which actual cash reserves have been established with Crestmark in amounts determined by Crestmark in its commercially reasonable discretion.

I.    That Borrower is solvent, is able to pay its debts as they become due, and has sufficient capital to carry on its business.  This Agreement, the Loan Documents and the loans made by Crestmark do not render Borrower insolvent, and the Security Interest granted to Crestmark does not render Borrower insolvent.

14.    **BORROWER'S PROMISES**.  Borrower makes the following promises to Crestmark and these promises are effective until the Indebtedness is fully paid:

A.    To pay all Indebtedness when due and perform all terms, conditions and obligations of the Loan Documents.

B.    To permit Crestmark, or its representatives, access to the Collateral on Borrower's premises and to Borrower's computer systems, books of account and financial records.

C.    To notify Crestmark promptly of any litigation, administrative or tax proceeding or other action threatened or instituted against the Borrower or its property, or of any other material matter which may adversely affect Borrower's financial condition.  The amount of claims as to which Borrower must notify Crestmark is specified in the Schedule.

4

1504086.02

**D.**    To pay when due all taxes, assessments and governmental charges, provided that the Borrower has the right to contest the same as long as it has, in the opinion of Crestmark, sufficient cash reserves to pay the charge when due.

**E.**    To maintain its business by complying with the Financial Covenants described in the Schedule.

**F.**    To maintain property and liability insurance on its business activities in such amount and in such form as Crestmark may from time to time require, and with respect to such insurance, Crestmark shall be named as "Lender Loss Payee" under the property policy and additional insured under the liability policy and receive evidence of the insurance on an annual basis, as well as workers' compensation insurance in such amount and in such form as Crestmark may from time to time require, and with respect to such workers' compensation insurance, Crestmark shall be named as "Certificate Holder" under the policy and receive evidence of the insurance on an annual basis. All insurance which protects Crestmark shall have at least a 30-day notice to Crestmark prior to any cancellation. With respect to the insurance, Borrower appoints Crestmark as its attorney-in-fact to negotiate any and all claims under all insurance policies and Crestmark also has the power to negotiate any payments on the insurance policies. Further, Borrower shall at all times maintain workers' compensation

**G.**    To comply with all laws, ordinances and regulations or other requirements of any governmental authority or agency applicable to Borrower's business.

**H.**    To maintain and preserve all Collateral in good repair, working order and condition, and with respect to accounts, pursue collections thereof.

**I.**    To provide Crestmark with evidence of ownership of any Collateral.

**15.    NEGATIVE COVENANTS.**    Borrower agrees until the Indebtedness is paid in full, it will not:

**A.**    Change its state of organization or its name, or move its executive office without giving Crestmark at least 60 days prior written notice or at any time adopt any assumed name.

**B.**    Declare or pay any dividend or make any other distribution with regard to its equity or purchase or retire any of its equity, provided if it is taxed as an S Corporation or other "pass through" entity, Borrower may distribute profits to its equity holders in an amount necessary to enable such holders to pay personal, state and federal taxes directly attributable to the profits earned by Borrower for such year, provided, however that notwithstanding the foregoing, the borrower and TGI Acquisition, Inc., may make intercompany transfers among them in the ordinary course of business.

**C.**    Make any loan or assume any obligations or liabilities, as guarantor, surety, indemnitor or otherwise.

**D.**    Enter into any transaction with its equity holders or any affiliates of Borrower except on terms at least as favorable as would be usual and customary in similar transactions if the person with whom the transaction is entered into was not related to Borrower.

**E.**    Release, redeem, require, purchase or acquire any of its equity interest.

**F.**    Default in the payment of any debt in excess of $25,000.00 to any other person, except as set forth on Exhibit "15" attached hereto.

**G.**    Suffer or permit any judgment, decree or order not fully covered by insurance to be entered against the Borrower or a Guarantor, or permit or suffer any warrant or attachment to be filed against Borrower, any Guarantor, or against any property or asset of Borrower or Guarantor.

**16.    FINANCIAL REPORTS.**    Borrower promises that until the Indebtedness is fully paid and this Agreement is terminated, it will keep books in a manner satisfactory to Crestmark and Crestmark will have the right at any time to verify any of the Collateral, documentation or books in whatever manner and as often as Crestmark deems necessary. Borrower will furnish to Crestmark the financial reports identified on the Schedule, certified to by the president or chief financial officer of the Borrower. All financial reports will be prepared in accordance with generally acceptable accounting principles and will be true and accurate.

5

1504086.02

17.  **CRESTMARK'S REMEDIES**.  Crestmark has all the remedies available at law or in equity (including those under the UCC) in the event Borrower either violates this Agreement or fails to pay the Indebtedness on demand, including but not limited to the following: to charge the Extra Rate; to notify Account Debtors to make the payments directly to Crestmark; to settle or compromise any disputed account, sue on any account and make any agreement to deal with the accounts as if it were the owner; to offset any of Borrower's or Guarantor's funds under the control of Crestmark against the Indebtedness; and to require the Borrower to gather up the Collateral and make it available to Crestmark for Crestmark to conduct public or private UCC foreclosure sales. If Crestmark should proceed against the Collateral and sell any of the Collateral on credit, the Borrower will be credited on the Indebtedness only with the amount actually received by Crestmark and the Borrower waives any and all provisions as to notice or a particular method of sale of any of the Collateral. The Borrower will pay all expenses in connection with the assembly or sale of the Collateral.  Crestmark does not have to incur its own expenses in realizing upon the Collateral, but all the expenses are for the account of the Borrower.  Borrower recognizes that at no time is Crestmark its agent in dealing with the Collateral, but Crestmark acts only in its own interest.

18.  **STANDARDS APPLICABLE TO REMEDIES**.  If Crestmark should exercise any remedies, Borrower agrees that it is not commercially unreasonable for Crestmark: to fail to exercise remedies against any Collateral or any particular Account Debtor; to proceed against Account Debtors either directly or through collection agencies; to advertise disposition of Collateral through publications or media of general circulation; to hire professional auctioneers to dispose of Collateral; to dispose of Collateral in wholesale or retail markets; to disclaim warranties with respect to Collateral; or to obtain services of attorneys or other professionals. The foregoing section is to provide an exhaustive list and nothing contained in the foregoing grants any rights to the Borrower, which are not granted by applicable law or the Loan Documents.  Borrower agrees that under no circumstances is Crestmark the agent or representative of the Borrower.

19.  **APPLICATION OF PROCEEDS**.  Once collection efforts are commenced by Crestmark, any proceeds of sale or disposition of Collateral may be applied by Crestmark first to expenses authorized by this Agreement including Crestmark's actual attorneys' fees which Borrower must pay, and the balance to payment of the Indebtedness in such manner as Crestmark may elect.  Borrower and Guarantor remain liable for any deficiency.

20.  **NOTICES**.  Any notice is effective by either party if sent in writing or facsimile with confirmation of receipt or by certified mail or personal delivery or expedited mail services to the addresses shown on the Schedule.

21.  **MISCELLANEOUS PROVISIONS**.

A.    This Agreement is binding upon and is for the benefit of the Borrower, Guarantor and Crestmark, and their respective successors and assigns.  However, under no circumstances may Borrower assign this Agreement or its rights and duties hereunder.  Crestmark may assign this Agreement and its rights under the Loan Documents and Borrower will make payments to any such assignee if so directed.

B.    Crestmark has the right at any time to assign, transfer, negotiate or sell participations in this Agreement or the Indebtedness or the rights of Crestmark hereunder.  In connection with any assignment, Borrower consents to disclosure of any and all books, records, files, Loan Documents and all other documents in the possession or under the control of Crestmark.

C.    No delay or failure of Crestmark in exercising any right or remedy will affect such right or remedy. No delay or failure of Crestmark to demand strict adherence to the terms of this Agreement will be deemed to waive Crestmark's rights to demand such adherence at any time in the future.

D.    This Agreement and the Loan Documents will be interpreted and determined under the laws of the State of Michigan without any regard to any conflict of laws provisions.

E.    Borrower and Guarantor, at Crestmark's request, will make, execute and acknowledge any and all further instruments or agreements necessary to carry out the intent of this Agreement the Loan Documents.

F.    Borrower hereby agrees to indemnify, defend and hold Crestmark harmless against any and all liabilities of any kind, nature or description and damages whether they are direct, indirect or consequential and actual attorney's fees incurred or suffered directly or indirectly by Crestmark or asserted against Crestmark by

6

1504086.02

anyone whosoever, including Borrower or Guarantor, which arise out of the Loan Documents or the relationship and transaction between the Parties (but excluding any such liabilities incurred by reason of the willful misconduct, gross negligence or actual fraud of Crestmark).

**G.**   Neither Crestmark or its affiliates directors, officers, agents, attorneys or employees are liable to Borrower or Guarantor or affiliates for any action taken or omitted by it or any of them under the Loan Documents except for such liability as may be imposed by law for gross negligence, willful misconduct or actual fraud, and no claim shall be made by Borrower or Guarantor or any of Borrower's affiliated, directors, officers, agents, employees for any special or consequential damages or punitive damages arising out of, or related to the Loan Documents or the transactions between the Parties.

**H.**   This Agreement is the complete Agreement between the parties and there are no other agreements. This Agreement may be amended only in writing.

**I.**   If any provision of this Agreement is in conflict with any law or statue or is otherwise unenforceable, then the provision will be deemed null and void only to the extent of such provision and the provision will be deemed severable and the remainder of this Agreement shall be in full force and effect.

**J.**   Any payment made to Crestmark by either Borrower or Guarantor which is subsequently invalidated, declared fraudulent or preferential or otherwise set aside under any bankruptcy, state, federal or equitable law, then to the extent of such invalidity such payment will be deemed not to have been made and the obligation will continue in full force and effect.

**K.   USA Patriot Act Notification** – The following notification is provided to Borrower pursuant to Section 3265 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

> **IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.**  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan or other extension of credit.  We will ask for the name, address, date of birth, and other information that will allow us to identify all Borrower's owners.  We will also ask to see your driver's license or other identifying documents.

**22.   JURISDICTION.**   BORROWER AND GUARANTOR AGREE THAT ANY ACTION TO ENFORCE BORROWER'S OR GUARANTOR'S OBLIGATIONS TO CRESTMARK SHALL BE PROSECUTED EITHER IN THE CIRCUIT COURT OF OAKLAND COUNTY MICHIGAN OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, UNLESS CRESTMARK, IN ITS SOLE DESCRETION, ELECTS SOME OTHER JURISDICTION AND BORROWER AND GUARANTOR SUBMIT TO THE JURISDICTION OF ANY SUCH COURT SELECTED BY CRESTMARK.  BORROWER AND GUARANTOR WAIVE ANY AND ALL RIGHTS TO CONTEST THE JURISDICTION AND VENUE OF ANY ACTION BROUGHT IN THIS MATTER AND BORROWER AND GUARANTOR MAY BRING ANY ACTION AGAINST CRESTMARK ONLY IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND OR THE FEDERAL COURT OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

**23.   WAIVER.**   ALL PARTIES, INCLUDING BORROWER AND GUARANTOR EACH KNOWINGLY AND VOLUNTARILY WAIVE ANY CONSTITUTIONAL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM, DISPUTE OR CONFLICT BETWEEN THE PARTIES OR UNDER THE LOAN DOCUMENTS AND AGREE THAT ANY LITIGATION SHALL BE HEARD BY A COURT OF COMPETENT JURISDICTION SITTING WITH OUT A JURY.   BORROWER AND GUARANTOR ACKNOWLEDGE THAT THEY HAVE HAD THE OPPORTUNITY TO REVIEW THE EFFECT OF THIS PROVISION WITH COUNSEL OF THEIR CHOICE.

**24.   RELEASE.  BORROWER AND GUARANTOR RELEASE AND FOREVER DISCHARGE CRESTMARK, ITS AFFILIATES, OFFICERS, AGENTS, EMPLOYEES AND DIRECTORS FROM ANY AND ALL CLAIMS OF ANY KIND WHATSOEVER FROM THE BEGINNING OF TIME TO DATE OF THIS AGREEMENT.**

7

1504086.02

25.    **JOINT AND SEVERAL OBLIGATIONS; DEALINGS WITH MULTIPLE BORROWERS**.
If more than one person or entity is named as Borrower hereunder, all obligations, representations, warranties, covenants and indemnities set forth herein or in any other loan documents between the Borrower, Crestmark and any guarantors of the Borrower's obligations to Crestmark (collectively the "Loan Documents") to which such person or entity is a party shall be joint and several.   Crestmark shall have the right to deal with any individual of any Borrower with regard to all matters concerning the rights and obligations of Crestmark and Borrower hereunder and pursuant to applicable law with regard to the transactions contemplated under the Loan Documents. All actions or inactions of the officers, managers, members and/or agents of any Borrower with regard to the transactions contemplated under the Loan Documents shall be deemed with full authority and binding upon all Borrowers hereunder. Each Borrower hereby appoints each other Borrower as its true and lawful attorney-in-fact, with full right and power, for purposes of exercising all rights of such person hereunder and under applicable law with regard to the transactions contemplated under the Loan Documents.   The foregoing is a material inducement to the agreement of Crestmark to enter into this Agreement and to consummate the transactions contemplated hereby. The Borrower represents that **NURSES IN PARTNERSHIP, INC.**, a Delaware corporation, **HEALTHTALENT INC.**, a Delaware corporation and **TECHGROUP, INC.**, a Washington corporation are operated as part of one consolidated business entity and are directly dependent upon each other for and in connection with their respective business activities and financial resources. Each Borrower will receive a direct economic and financial benefit from the obligations incurred under this Agreement and the incurrence of such obligations is in the best interests of each Borrower.

The parties have executed this Agreement as of the date and year first written above.

**CRESTMARK:**

**CRESTMARK BANK**, a Michigan banking corporation

By: _____
Its: _____

**BORROWER:**

**NURSES IN PARTNERSHIP, INC.**, a Delaware corporation

By: _____
Its: _____

**HEALTHTALENT INC.**, a Delaware corporation

By: _____
Its: _____

**TECHGROUP, INC.**, a Washington corporation

By: _____
Its: _____

The undersigned Validity Guarantors by signing this Agreement agrees that they read and understand the Agreement and Validity Guarantors agrees to all of its terms.

**VALIDITY GUARANTORS:**

_____

8

1504086.02

_____
Ewa Markowicz-Barsam aka Ewa Barsam, individually


_____
Ephraim Barsam, individually


_____
David McGreavy, individually


_____
Sharon Ann McGreavy, individually

9

Exhibit 13

Listing of litigation matters:

1. Esther Barsam v Nurses in Partnership Inc. Claim re loan note vigorously being defended. Equity was issued instead of loan.
2. Damon & Morey – Attorneys for HT Acquisition claiming fees for acquisition over what was agreed ($150,000) – Enhanced had agreed $60,000.
3. Action by HT against Memorial Hospital of Gardena – Claim for $500,000 plus punitive damages.

Listing of Tax issues:

1. Payroll taxes for 2nd and 3rd quarters as previously disclosed. 1st quarter paid in full.
2. State taxes paid in full apart from California Tax – 2 quarters behind.

Exhibit 15

Listing of Loan Defaults

11

**SCHEDULE TO LOAN AND SECURITY AGREEMENT**
DATED: October __8__, 2009

This Schedule is part of the Agreement between:

CRESTMARK BANK ("CRESTMARK")
5480 CORPORATE DRIVE
SUITE 350
TROY, MICHIGAN 48098

AND

NURSES IN PARTNERSHIP, INC. ("NIP")
HEALTHTALENT INC. ("HTI")
TECHGROUP, INC. ("TGI") (collectively "BORROWER")
29219 Canwood Street, Suite 220
Agoura Hills, CA 91301 (as to NIP and HTI)
244 West Main
Spokane, WA 99201 (as to TGI)


I.    The following paragraph numbers correspond to paragraph numbers contained in the Agreement.

3.    **LOAN**. The Indebtedness will not exceed an amount which is the lesser of:

(a)    Two Million and 00/100 Dollars ($2,000,000.00) ("Maximum Amount"), or

(b)    (i) up to eighty-five percent (85%) of Eligible Accounts

(the above being the "Advance Formula").

Crestmark shall not allow any advances against (A) Accounts not previously approved by Crestmark where the expected dollar value for such Account Debtor is greater than the lesser of (i) five (5%) percent of Borrower's existing Accounts, or (ii) $50,000.00 subject to review and change by Crestmark from time to time thereafter, provided, however, as to Alameda County, California and Los Angeles County, California only, the lesser of (i) twenty (20%) percent of Borrower's existing Accounts, or (ii) $225,000.00, subject to review and change by Crestmark from time to time thereafter; as to All About Staffing , Inc., only, the lesser of (i) fifteen (15%) percent of Borrower's existing Accounts, or (ii) $150,000.00, subject to review and change by Crestmark from time to time thereafter; as to Centinela Hospital Medical Center only, the lesser of (i) ten (10%) percent of Borrower's existing Accounts, or (ii) $110,000.00, subject to review and change by Crestmark from time to time thereafter; or (B) all of the Accounts owed by an Account Debtor where 50% or more of all of the Accounts owed by that Account Debtor are unpaid more than 90 days from the invoice date.

Crestmark may in its sole discretion raise or lower the advance rate with respect to the Advance Formula. In addition, Crestmark may establish cash reserves and credit balances to protect its interests as set forth in the Agreement, including, without limitation, a Dilution Reserve. "Dilution Reserve" means the Dilution Percentage less the Base Dilution. The Dilution Percentage is defined as: (i) uncollectable sales (as determined by Crestmark in its sole discretion, exercised in a commercially reasonable manner, and including all sales subject to a customer dispute) excluding Accounts that remain unpaid but are collectable, divided by (ii) total sales and (iii) stated as a percentage, as determined by Crestmark. Base Dilution means: five percent (5%). Crestmark shall reserve the advance rate for Eligible Accounts by two percent (2%) for each percentage point that Base Dilution exceeds 5%.

**Eligible Accounts** are accounts that arise in the ordinary course of business, are represented by an invoice, are presently due, are free from any dispute, are not from any parent, subsidiary or affiliate of Borrower, and are acceptable to Crestmark in its sole discretion. Excluded from Eligible Accounts are accounts that: (i) are more than 90 days from invoice date; (ii) are from an Account Debtor that is located outside the United States; (iii) are from an Account Debtor on a bill and hold, guaranteed sale, C.O.D. sale, return sale of any kind, sale on approval,

1504088.02

consignment or other conditional sale; (iv) are for tooling; or (v) are contra accounts or are from an Account Debtor who is owed money by Borrower; or are deemed unacceptable by Crestmark in its sole discretion.

7.    **Fees**.  The following fees will be charged to the Borrower:

**Late Reporting Fee**:  Borrower will pay Crestmark a fee (the "Late Reporting Fee") in an amount equal to One Hundred Fifty ($150.00) Dollars per document per business day for any day past thirty (30) days in which any report, financial statement or schedule required by the Agreement is delivered late.

**Loan Fee**:  Borrower will pay at closing and on each annual anniversary of the date of the Agreement, Crestmark a non-refundable loan fee in the amount of one percent (1%) of the Maximum Amount, which will be fully due on each such date, but, as a courtesy to Borrower, may be paid in twelve (12) equal consecutive monthly payments commencing on date of execution of this Agreement and continuing on the first day of each month thereafter.

**Maintenance Fee**.    Each month Borrower will pay Crestmark a monthly maintenance fee (the "Maintenance Fee") of Two Thousand and 00/100 Dollars ($2,000.00) commencing on the first (1st) day of October, 2009 and continuing on the first (1st) day of each month thereafter until Borrower has no Indebtedness outstanding and this Agreement is terminated.

"Tangible Net Worth" means, as of the date of determination, total assets less total liabilities less the sum of (i) the aggregate amount of non-trade Accounts Receivable, including Accounts Receivable from affiliated or related Persons; (ii) prepaid expenses; (iii) deposits; (iv) net leasehold improvements; (v) goodwill; and (vi) any other asset which would be treated as an intangible asset under GAAP.  "Subordinated Debt" means any and all indebtedness presently or in the future incurred by Borrower to any creditor of Borrower entering into a written subordination agreement with Crestmark.

"Working Capital Ratio" means current assets divided by current liabilities.

"Cash Flow" means (i) net income plus (ii) depreciation and amortization less (iii) debt service, distributions and dividends, loans and advances to employees and shareholders and non-financed capital expenditures.

**Lockbox Fee.**    Each month the Borrower will pay all costs in connection with the Lockbox and the Lockbox Account, as determined by Crestmark from time to time.

8.    **MINIMUM LOAN BALANCE**.  At all times the minimum Loan balance that Borrower must maintain is: $250,000.00. The minimum Loan balance shall be used in determining the interest payable under the Note.

12.    **LOCKBOX.**  The Lockbox Bank is:

> Drawer #1348
> PO Box 5935
> Troy, MI 48007-5935

13.    **REPRESENTATIONS.**

(A)    NIP and HTI are each corporations organized in the State of Delaware, and TGI is a corporation organized in the State of Washington.

- 2 -

**(B)** List Security Interests in the Collateral held by creditors other than Crestmark as Permitted Encumbrances:

Enhanced Colorado Issuer, LLC and other note holders, who hold a security interest in the assets of the Borrower subordinate to the interests of Crestmark.

**NOTE:** As to the interests listed above, the listing thereof in this Loan and Security Agreement shall not, in any manner whatsoever, be deemed to be an acknowledgement by Crestmark as to the perfection, priority, validity or enforceability thereof.

(C) Borrower uses the following Trade names: NONE

(D) Borrower's Federal Identification Number(s) are as to NIP: 35-2182319, as to HTI: 84-1562790 and as to TGI: 91-1510299.

(E) Borrower's Organizational Number(s) are: as to NIP: 3571324, as to HTI: 3836808 and as to TGI: 601295722.

**14. Financial Covenants:** Commencing January 1, 2010, Borrower will maintain the following Financial Covenants, which will be tested on a quarterly basis, on a consolidated basis:

A. Positive Tangible Net Worth, including Subordinated Debt. "Subordinated Debt" means debt subordinated to Crestmark under the terms of a subordination agreement acceptable to Crestmark.

B. Positive Working Capital. "Working Capital" means current assets less current liabilities.

C. Positive Cash Flow.

D. All payroll taxes, Federal & State are current or with confirmed payment plan from respective Government Agency(s) within 90 days of closing; if there is a tax lien, appropriate Subordination from Agency is required, prior to continued funding.

Accounts plus book cash, if any, less the Revolving Line of Credit balance, accrued payroll, accrued and withheld payroll taxes and book cash overdraft, if any, must be positive at Closing and at each time of funding.

In addition, at no time shall Borrower: (i) make any loans, advances, intercompany transfers or cash flow between the Borrower and any subsidiary who is not included within the definition of Borrower hereunde., related entity or affiliate of the Borrower or with any company that has common shareholders, officers or directors with the Borrower, other than TGI Acquisition, Inc.; (ii) make any distribution or declare or pay any dividends (in cash or in stock) on, or purchase, acquire, redeem or retire any of its common stock, membership or partnership interests, of any class, whether now or hereafter outstanding; (iii) enter into an agreement for the acquisition of the stock or assets of another company, or any merger or business combination without the prior written consent of Crestmark; or (iv) pay total compensation to officers of Borrower (or any of their relatives), including salaries, withdrawals, fees, bonuses, commissions, drawing accounts and other payments, whether directly or indirectly, in money or otherwise, during the each fiscal year of Borrower during the term of this Agreement in an aggregate amount for all such officers in excess of one hundred and fifty percent (150%) of the total compensation paid, or contractually liable to pay, in the prior fiscal year.

All of the financial covenants in this Agreement shall be determined in accordance with GAAP, unless otherwise provided. "GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination and applied on a consistent basis.

- 3 -

1504088.02

16.    **FINANCIAL REPORTS**.

**Management Prepared Financial Statements**: Borrower will deliver to Crestmark management prepared financial statements, balance sheets, and profit and loss statements for the month then ended, certified to by the president or chief financial officer of Borrower. Such reports will set forth the financial affairs and true condition of Borrower for such time period and will be delivered to Crestmark no later than sixty (60) days after the end of each month.

All financial statements are and will be prepared in accordance with GAAP applied on a consistent basis, and on a consolidated and consolidating basis.

**Annual Financial Statements:** Each year Borrower will deliver to Crestmark annual audited financial statements, cash flow statements, balance sheets, and profit and loss statements prepared by a certified public accountant acceptable to Crestmark, all without exceptions. Such reports will set forth in detail Borrower's true condition as of the end of Borrower's fiscal year no later than one hundred fifty (150) days after the end of Borrower's fiscal years.

**Accounts Receivable, Accounts Payable Aging and Inventory Reports**: Borrower will furnish to Crestmark the following certified to by the president or chief financial officer of Borrower within the time periods set forth:

    (a)    **Accounts Receivable Reports**: Monthly detailed Accounts Receivable Aging Reports no later than fifteen (15) days after the end of each month;

    (b)    **Accounts Payable Reports**: Monthly detailed Accounts Payable Aging Reports no later than fifteen (15) days after the end of each month; and

    (c)    **Payroll Reports**: Monthly payroll and tax payment reports no later than fifteen (15) days after the end of each month.

    (d)    **Borrowing Base Certificate**: Weekly borrowing base certificates together with all such documentation as required by Crestmark.

    (e)    **Weekly Reports:** Weekly detailed invoice reporting including invoices and proof of service, and including detailed credit memo report including copies of all credit memos and detailing of cash receipts.

**Guarantor's Financial Statements:** Guarantor will provide Crestmark with annual statement of net worth on forms previously provided by Guarantor. Such reports will set forth with detail Guarantor's financial affairs and the true financial condition of Guarantor, as of the end of each calendar year and shall be delivered to Crestmark on the earlier of April 30th or 120 days after the end of each calendar year.

**Tax Returns:** Guarantor and Borrower will each provide Crestmark with current annual tax returns prior to April 15 of each year or if an extension is filed, at the earlier of (a) filing, or (b) the extension deadline.

**Field Examinations:** Borrower shall reimburse Crestmark for the costs to perform three (3) field examinations per year of Borrower's assets and liabilities, to be performed by Crestmark's inspector, whether a Crestmark officer or an independent party with all expenses (whether for a Crestmark employee or otherwise, at the rate of $850.00 per person per day for each day of the field examination including preparation of the field examination report, together with all out of pocket expenses including, but not limited to, transportation, hotel, parking, and meals) paid by Borrower. Upon an event of Default, the number of field examinations to be reimbursed by the Borrower can be increased in Crestmark's sole discretion.

**Tax Deposit Evidence:** Submit weekly payroll summaries and copies of monthly bank statements from which the funds are impounded.

- 4 -

1504088.02

**Customer Lists**:  Upon Crestmark's request, Borrower will deliver to Crestmark detailed customer lists showing the customer's name, address, phone number and any other information Crestmark requests.

**Projections:**      Borrower shall deliver to Crestmark, within sixty (60) days prior to each year-end, an annual financial projection for the following year, broken down monthly.

**Other Information**:  Borrower and Guarantor will also deliver to Crestmark such other financial statements, financial reports, documentation, tax returns and other information as Crestmark requests from time to time.

II.    **Modifications**

The following provisions of the Loan and Security Agreement are amended as follows:

a.  The following language is added to the end of Section 3.F. of the Agreement:

"In the event that Advances are made in excess of Availability and the Borrower does not repay such overage immediately, Crestmark, in addition to its other rights herein, may charge a fee of 0.0493% per day on the amount of such overage."

b.  Section 4., subsections A., B. and C are deleted in their entirety and the following are substituted in their place:

"**A.**   Before Crestmark makes any Advance to the Borrower, the Borrower must give Crestmark security for repayment of the Indebtedness.  This security is known as a "Security Interest".  Borrower, by signing this Agreement, grants to Crestmark a Security Interest in all of its assets, now existing and hereafter arising, wherever located, including, without limitation, all accounts, goods, inventory, equipment, chattel paper, instruments, investment property, specifically identified commercial tort claims, documents, deposit accounts, letter of credit rights, general intangibles and supporting obligations for any of the foregoing (the "Collateral"), to secure repayment of the Indebtedness.  The Collateral also includes all monies on deposit with Crestmark, or on deposit in the Lockbox Account which is described later.  If any of the foregoing is at any time disposed of or sold, Crestmark also has a Security Interest in all of the proceeds of any of the foregoing.

**B.**    Crestmark has the right to perfect its Security Interest by filing what is known as a financing statement or by taking possession of certain Collateral.  In connection with the Security Interest, Borrower gives Crestmark all of the rights of a secured creditor under the Uniform Commercial Code (the "UCC").  All expenses of Crestmark relating to the Security Interest are part of the Indebtedness.  In addition, the Borrower grants Crestmark the authority to file all appropriate documentation in order for Crestmark to perfect its security interest in the Collateral, including, without limitation, a UCC-1 financing statements that lists the collateral as "All assets of the Debtor, now existing and hereafter arising, wherever located," or similar terms.

**C.**    In connection with the Security Interest, Borrower must notify all persons who owe it on account ("Account Debtor") of the Crestmark Security Interest on a form approved by Crestmark and all Account Debtors must be instructed to make all payments on the account, whether by credit cards, check or electronic transfer, to the Lockbox Bank, or as instructed by Crestmark in its sole discretion."

c.  Section 5., subsections A. and B. are deleted in their entirety and the following are substituted in their place:

"**A.**   Advances with respect to the Loan are always discretionary with Crestmark.   In connection with any request for an Advance, if the request is based upon specific Eligible Accounts, the Borrower must also furnish to Crestmark at the same time invoices, credit memos, purchase orders, evidence of delivery, proof of shipment, timesheets, a cash receipts journal or summary thereof, and any other documents Crestmark requests, in its sole discretion, with respect to the accounts that Borrower is tendering to Crestmark to support the Advance ("Account Documents").   At the request of Crestmark Borrower will provide a

- 5 -

1504088.02

Borrowing Certificate in form approved by Crestmark before the Advance is made. Crestmark will endeavor to provide the requested funds by the end of the business day on the date that it receives the request so long as the complete package of information for the request has been received by 10:30 a.m. Eastern Time. All requests for funding will be subject to Crestmark's then standard fees for electronic funds transfer, wire transfers and check services.

**B**.         Borrower must instruct all Account Debtors to remit all collateral proceeds to the Lockbox Bank. At Crestmark's request, all documents related to the accounts must be marked by Borrower to show assignment to Crestmark and the Borrower must notify each Account Debtor by mail, in accordance with a form approved by Crestmark that the account has been assigned to Crestmark and that all payments on the account whether made by mail or electronically or otherwise must be made payable to the Borrower at the address provided in the letter, which is the Lockbox Account. The address for payments will be the Lockbox Bank specified in the Schedule. All expenses for notification of each Account Debtor will be paid by the Borrower. All expenses plus any applicable administration fees of the Lockbox will be paid by Borrower. All accounts specifically submitted to Crestmark with Account Documents for which an Advance is made will be known as Crestmark Accounts (the "Crestmark Accounts"). Crestmark may at any time and from time to time, and at its sole discretion, notify any Account Debtor of Borrower or any third party payer to make payments directly to Crestmark. "

a.    Section 8 is deleted and the following is substituted in its place:

"**8.    MINIMUM BALANCE**.  Borrower agrees that it will maintain a minimum Loan balance in the amount shown on the Schedule for the period shown and Borrower understands that the Interest Rate and the Maintenance Fee will be calculated on the greater of the Minimum Loan Balance or the Actual Loan Balance."

b.    Section 13. is amended by the addition of subsection J. to provide as follows:

"J.  That all Accounts assigned to Crestmark are bonafide accounts arising from the sale of inventory or providing services, and are not subject to offset or counterclaim and are free and clear of all encumbrances of any kind whatsoever."

c.    Section 15.G. is deleted in its entirety and the following is substituted in its place:

"**G**.  Suffer or permit any judgment, lien, tax lien, decree or order not fully covered by insurance or cash reserve maintained by Crestmark to be entered against the Borrower or a Guarantor, or permit or suffer any warrant or attachment to be filed against Borrower, any Guarantor, or against any property or asset of Borrower or Guarantor.

d.    By the addition of Section 25 to provide as follows:

"**25.      INDEMNIFICATION**:  Borrower hereby indemnifies and holds Crestmark and its executive committees, parent, affiliates, subsidiaries, agents, directors, officers, participants, employees, agents, and their successors and assigns (collectively the "Indemnified Parties") harmless against any damages or claims arising from Crestmark collecting or attempting to collect any Accounts and from any and all costs, claims, expenses, actions and liabilities, including fees of attorneys and other professionals and experts, costs of suit and interest, arising out of any failure by Borrower or Borrower's documentation to comply with all applicable laws, rules and regulations.

Should any excise, sales, documentary stamp, intangible, service or other tax be imposed by state, federal or local authorities with respect to any of the transactions hereunder in such form that Crestmark is required to withhold, collect or pay such taxes, Borrower agrees to disclose such requirement to Crestmark and to indemnify the Indemnified Parties with respect to such payments, and Crestmark shall be entitled to charge and collect such payments from Borrower's account. In addition, Borrower agrees that if any taxing authority, at any time hereafter, including after the termination of this Agreement, takes the position that stamp or other taxes are applicable to this Agreement, or any renewals or extensions thereof, or Crestmark make such

- 6 -

1504088.02

determination, Crestmark will pay all such taxes, and any interest and penalties or other liabilities in connection therewith, and will collect such amounts from the Borrower. Crestmark expressly disclaims any obligation to Borrower with respect to state, local or Federal income taxation and the preparation of income tax reports or returns, except as agreed to between the parties herein. It is agreed that Crestmark shall not in any way be considered a "responsible party" in connection with the payment of any taxes on behalf of Borrower.

Borrower hereby indemnifies and holds Indemnified Parties harmless from any and all liability, claims and damages, including fees of attorneys (including in-house counsel for the Indemnified Parties) and other professionals and experts, costs of suit and interest which any of the Indemnified Parties may incur as a result of the failure of Borrower to pay any taxes due and payable to any taxing authority. Borrower does further agree to immediately notify Crestmark of any failure to pay federal, state or local taxes due in connection with any of its business enterprises. Borrower further agrees to provide to Crestmark true and accurate copies of any tax liens or warning notices received by Borrower in connection with its business enterprises whether related to this Agreement or not.

Borrower hereby indemnifies and holds Indemnified Parties harmless from any and all liability, claims and damages, including fees of attorneys (including in-house counsel for Crestmark) and other professionals and experts, costs of suit and interest which any Indemnified Party may incur as a result of Crestmark, or any of its agents, including any Indemnified Parties, initiating ACH Transfers from or to any deposit account maintained by the Borrower.

Borrower hereby releases, discharges and holds harmless Indemnified Parties from all liabilities, actions, suits, causes of action, costs, expenses, fines, penalties, claims, judgments and demands whatsoever which the Borrower or any other person or entity had or may have now or in the future against one or more of them under or arising out of this Agreement between Borrower and Crestmark, or any acts or omissions in connection herewith; provided, however, that nothing herein shall preclude the enforcement by Borrower and Crestmark of all rights and benefits conferred in this Agreement.

Borrower does hereby warrant that there has been no mortgage or loan broker involved in connection with the transaction contemplated by this Agreement, and Borrower agrees to indemnify and hold harmless the Indemnified Parties from any and all liability, claims and damages, including fees of attorneys (including in-house counsel for Crestmark) and other professionals and experts, costs of suit and interest which Crestmark may incur as a result of any claim of compensation payable to any mortgage or loan broker in connection with the transaction contemplated by this Agreement.

Borrower hereby indemnifies and holds Indemnified Parties harmless from any and all liability, claims and damages, including fees of attorneys (including in-house counsel for Crestmark) and other professionals and experts, costs of suit and interest which Crestmark may incur as a result of the failure of Borrower to comply with any environmental laws.

The indemnifications set forth herein shall survive the termination of this Agreement."

h.        By the addition of Section 26 to provide as follows:

**26.        TERM**  This Agreement shall continue in full force and effect until demand, but if not sooner demanded then for three (3) years from the date hereof (the "Term"), and shall be automatically renewed for consecutive two (2) year terms unless terminated by written notice of either party sixty (60) days prior to the end of the initial Term or any renewal Term. In the event of termination by Borrower of this Agreement or repayment in full of the Indebtedness prior to the expiration of the Term or any renewal Term, Borrower shall pay to Crestmark, as an early termination fee: (i) an amount equal to three percent (3%) of the Maximum Facility if such repayment is during the initial year of the Term or any renewal Term; two percent (2%) of the Maximum Facility if such repayment is during the second year of the Term or any renewal Term; and one percent (1%) of the Maximum Facility if such repayment is during the final year of the Term; plus, in any event, any unpaid facility fees and monthly maintenance fees due under the remaining Term of the Agreement (the "Early Termination Fee") . In the event that payment of the Indebtedness shall be accelerated for any

- 7 -

reason whatsoever by Crestmark, the Early Termination Fee in effect as of the date of such acceleration shall be paid and such Early Termination Fee shall also be added to the outstanding balance of the Indebtedness in determining the debt for the purposes of any judgment of foreclosure of any loan documents given to secure the Indebtedness.

After termination Borrower shall continue to be liable to Crestmark for the full and prompt performance and payment of the full amount of all Indebtedness to Crestmark which for any reason remain, or otherwise are, then outstanding and unpaid, whether disputed or undisputed.  Crestmark will continue to have a security interest in the Collateral of Borrower until any and all Indebtedness are paid in full.  When Crestmark has received payment and performance in full of all Indebtedness and an acknowledgment from Borrower that it is no longer entitled to request any advances from Crestmark under this Agreement, Crestmark shall execute a termination of all security interests given by Borrower to Crestmark, upon the execution and delivery of general releases by Borrower, any guarantor or surety of Borrower's Indebtedness to Crestmark."

**NURSES IN PARTNERSHIP, INC.**

By:_____

Its:_____

**HEATHTALENT INC.**

By:_____

Its:_____

**TECHGROUP, INC.**

By:_____

Its:_____

**CRESTMARK BANK**

By:_____

Its:_____

- 8 -

The undersigned Validity Guarantors by signing this Schedule agree that they read and understand the Schedule and Validity Guarantors agrees to all of its terms.

**VALIDITY GUARANTORS:**

_____
Ewa Markowiez-Barsam aka Ewa Barsam, individually

_____
Ephraim Barsam, individually

_____
David McGreavy, individually

_____
Sharon Ann McGreavy, individually

- 9 -

1504088.02

# EXHIBIT 3

Uncleared Payroll Checks

| Check Date | Employee Name | 11/26/2010 $ Amount | 12/27/2010 $ Amount | 12/31/2010 $ Amount | 1/7/2011 $ Amount | 1/10/2011 $ Amount | Total |
|---|---|---|---|---|---|---|---|
| 1/7/2011 | Dittman, Bryon | | | | $739.85 | | $739.85 |
| 1/7/2011 | Glandorf, Tara | | | | $877.50 | | $877.50 |
| 1/7/2011 | Cantu, Hope | | | | $1,360.71 | | $1,360.71 |
| 1/7/2011 | Andresen, Karen | | | | $1,073.16 | | $1,073.16 |
| 1/7/2011 | Moran, Patricia | | | $1,388.12 | $1,946.64 | | $3,334.76 |
| 1/7/2011 | Rudd, Stacy | | | | $1,345.12 | | $1,345.12 |
| 1/7/2011 | White, Amanda | $511.29 | | $717.95 | $898.31 | | $2,127.55 |
| 1/7/2011 | Hert, Ronald | | | | $1,569.63 | | $1,569.63 |
| 1/7/2011 | Sadowski, Lauri | | | | $1,143.11 | | $1,143.11 |
| 1/7/2011 | Clements, Linda | | | | $1,315.25 | | $1,315.25 |
| 1/7/2011 | Bell, Thomas | | | | $1,185.51 | | $1,185.51 |
| 1/7/2011 | Bolen, Cynthia | | | | $898.46 | | $898.46 |
| 1/7/2011 | Cross, Karen | | | | $1,040.24 | | $1,040.24 |
| 1/7/2011 | Orji, Joy | | | | $990.50 | | $990.50 |
| 1/7/2011 | Rymal, Stephanie | | | | $1,248.32 | | $1,248.32 |
| 1/7/2011 | Latus, Matthew | | | | $1,276.47 | | $1,276.47 |
| 1/7/2011 | Weatherford, Brooke | | | | $1,357.33 | | $1,357.33 |
| 1/7/2011 | Hill, Natalie | | | | $880.36 | | $880.36 |
| 1/7/2011 | Jones, Emily | | | | $1,042.59 | | $1,042.59 |
| 1/7/2011 | Jose, Jasmin | | | | $1,168.27 | | $1,168.27 |
| 1/7/2011 | Miranda, Consuelo | | | | $511.05 | | $511.05 |
| 1/7/2011 | Lewis, Zelma Alma | | | | $803.49 | | $803.49 |
| 1/7/2011 | McElwee, Michelle | | | | $559.50 | | $559.50 |
| 1/7/2011 | Matheus, Alfredo | | | | $1,203.76 | | $1,203.76 |
| 1/7/2011 | Sullivan, Rhonda | | | | $744.66 | | $744.66 |
| 1/7/2011 | Pickrell, Roberta | | | | $1,167.46 | | $1,167.46 |
| 1/7/2011 | Tom Vaughn | | | | $186.92 | | $186.92 |
| 1/10/2011 | Robbins, Michelle | | | | | $1,410.88 | $1,410.88 |
| 1/10/2011 | Bargman, Marina | | | | | $1,229.34 | $1,229.34 |
| 1/10/2011 | Beisman, Julie | | | | | $1,160.68 | $1,160.68 |
| 1/10/2011 | Eagles, Jocelyn | | $1,037.43 | | | $1,047.77 | $2,085.20 |
| 1/10/2011 | Farris, Sylvia | | $43.44 | | | $1,096.45 | $1,139.89 |
| 1/10/2011 | Hettinger, Angela | | | | | $892.66 | $892.66 |
| 1/10/2011 | Ordoyne, Lynne | | | | | $2,095.95 | $2,095.95 |
| | | $511.29 | $1,080.87 | $2,106.07 | $28,534.17 | $8,933.73 | $41,166.13 |

Note: On 1/14 Payroll will need to go out. Should be approximately$30,000 - $32,000   $0.00

## PREPETITION INSIDERS

| | | 11/26/2010 $ Amount | 12/27/2010 $ Amount | 12/31/2010 $ Amount | 1/7/2011 $ Amount | 1/10/2011 $ Amount | Total |
|---|---|---|---|---|---|---|---|
| 1/10/2011 | Barsam E | | | | | $5,000.00 | $5,000.00 |
| 1/10/2011 | Markowicz-Barsam, Ewa | | | | | $1,411.40 | $1,411.40 |
| 1/10/2011 | McGreary, David | | $3,308.75 | | | $3,085.51 | $6,394.26 |
| 1/10/2011 | McGreary, Sharon | | $1,869.65 | | | $2,093.65 | $3,963.30 |

# EXHIBIT 4

**IRS** Department of the Treasury
Internal Revenue Service

**CERTIFIED MAIL**

CCP-LU P. M. HICKS
6230 VAN NUYS BOULEVARD
LOS ANGELES, CA 91401

7178 2665 9394 9513 0432

RECEIVED
DEC 2 9 2010
BY:----------------

NURSES IN PARTNERSHIP INC
29219 CANWOOD ST STE 220
AQOURA, CA 91301-1588

003984

**Letter Date:** 12/16/2010
**Taxpayer Identification Number:**
35-2182319
**Person to Contact:**
P. M. HICKS
**Contact Telephone Number:**
(818) 756-4562
**Employee Identification Number:**
09-09590

### Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320

Dear NURSES IN PARTNERSHIP INC

We filed a Notice of Federal Tax Lien on  12/16/2010 .

| Type of Tax | Tax Period | Assessment Date | Amount on Lien |
|---|---|---|---|
| 941 | 06/30/2010 | 10/04/2010 | 128452.78 |
| 941 | 09/30/2009 | 03/01/2010 | 135300.00 |
| 941 | 12/31/2009 | 07/12/2010 | 327714.69 |
| 941 | 03/31/2010 | 06/28/2010 | 32259.03 |

NOTE:  Please contact the person whose name and telephone number appears on this notice to obtain the current amount you owe.  Additional interest and penalties may be increasing the amount on the lien shown above.

A lien attaches to all property you currently own and to all property you may acquire in the future.  It also may damage your credit rating and hinder your ability to obtain additional credit.

You have the right to a hearing with us to appeal this collection action and to discuss your payment method options.  To explain the different collection appeal procedures available to you, we have enclosed Publication 1660, Collection Appeal Rights.

You must request your hearing by  01/24/2011 . Please complete the enclosed Form 12153, *Request for a Collection Due Process or Equivalent Hearing,* and mail it to:

Internal Revenue Service
6230 VAN NUYS BOULEVARD
LOS ANGELES, CA 91401

Letter 3172 (DO) rev. (3-2009)
Catalog No. 26767I
66

COURT RECORDING DATA

```
       INTERNAL REVENUE SERVICE
   FACSIMILE FEDERAL TAX LIEN DOCUMENT    | Recording Number:
                                          | UCC Number       :
                                          | Liber            :
                                          | Page             :
   ---------------------------------------+---------------------------------------
   Area: SMALL BUSINESS/SELF EMPLOYED #7  | IRS Serial Number: 728699410
   Lien Unit Phone: (800) 913-6050        |
   -------------------------------------------------------------------------------
```

                This Lien Has Been Filed in Accordance with
                Internal Revenue Regulation 301.6323(f)-1.

003984

```
   -------------------------------------------------------------------------------
   Name of Taxpayer :
     NURSES IN PARTNERSHIP INC, a Corporation


   -------------------------------------------------------------------------------
   Residence :
     29219 CANWOOD ST STE 220
     AQOURA, CA 91301-1588
   -------------------------------------------------------------------------------
     With respect to each assessment below, unless notice of lien
     is refiled by the date in column(e), this notice shall constitute
     the certificate of release of lien as defined in IRC 6325(a).
```

| Form (a) | Period (b) | ID Number (c) | Assessed (d) | Refile Deadline (e) | Unpaid Balance (f) |
|---|---|---|---|---|---|
| 941 | 09/30/2009 | 35-2182319 | 03/01/2010 | 03/31/2020 | 135300.00 |
| 941 | 12/31/2009 | 35-2182319 | 07/12/2010 | 08/11/2020 | 327714.69 |
| 941 | 03/31/2010 | 35-2182319 | 06/28/2010 | 07/28/2020 | 32259.03 |
| 941 | 06/30/2010 | 35-2182319 | 10/04/2010 | 11/03/2020 | 128452.78 |

```
   -------------------------------------------------------------------------------
   Filed at:   COUNTY RECORDER                       |
               LOS ANGELES COUNTY          Total | $     623726.50
               NORWALK, CA 90650                      |
   -------------------------------------------------------------------------------
   This notice was prepared and executed at OAKLAND, CA
   on this, the 06th day of December, 2010.
   -------------------------------------------------------------------------------
   Authorizing Official:               | Title:
       P. M.  HICKS                    | REVENUE OFFICER          27-03-3857
                                       |
   -------------------------------------------------------------------------------
```

# EXHIBIT 5

|  | Jan 6, 11 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **800 · BANK OF AMERICA** | |
| **801 · General** | -12,502.82 |
| **803 · Payroll** | -12,115.57 |
| **804 · Utilities** | 102.82 |
| **806 · Expenses** | 26.12 |
| **Total 800 · BANK OF AMERICA** | -24,489.45 |
| | |
| **825 · Chase Bank** | |
| **827 · Payroll** | 2.00 |
| **Total 825 · Chase Bank** | 2.00 |
| | |
| **850 · Petty Cash** | -584.75 |
| **Total Checking/Savings** | -25,072.20 |
| | |
| **Accounts Receivable** | |
| **1200 · Accounts Receivable** | 293,330.44 |
| **Total Accounts Receivable** | 293,330.44 |
| | |
| **Other Current Assets** | |
| **1260 · Nurses -Overseas** | 8,241.12 |
| **1300 · Employee Advances** | 280.70 |
| **1311 · Prepaid- Insurance** | |
| **106 · Medical Insurance (Lvrs)** | 5,115.51 |
| **101 · Auto** | 529.56 |
| **102 · Crime** | 1,564.19 |
| **103 · Property** | 1,505.00 |
| **104 · Professional & General** | 21,660.46 |
| **105 · D & O Policy** | 5,573.15 |
| **1311 · Prepaid- Insurance - Other** | 225.50 |
| **Total 1311 · Prepaid- Insurance** | 36,173.37 |
| | |
| **1315 · Prepaid-Workers Comp** | 140,759.01 |
| **1344 · US Loan Acct** | 8,400.00 |
| **1345 · Intercompany** | 6,027.15 |
| **1346 · Intercompany (2)** | 22,799.13 |
| **1347 · Jacho Costs** | 3,484.92 |
| **1348 · Investment in HT** | 1,700,000.00 |
| **1349 · Investment in TGI** | 698,256.78 |
| **1350 · Factoring Holding Account** | 2,744.00 |
| **1400 · Security Deposit** | 32,206.56 |
| **1401 · Legal Retainers** | 51,000.00 |
| **1499 · Deferred Tax Assets** | 542,800.00 |

|                                          | Jan 6, 11     |
|------------------------------------------|--------------:|
| **Total Other Current Assets**           | 3,253,172.74  |
|                                          |               |
| **Total Current Assets**                 | 3,521,430.98  |
|                                          |               |
| **Fixed Assets**                         |               |
| 1451 · A/A-Organizational/Aqusition Co   | 26,059.93     |
| 1500 · Computer Equipment                |               |
| 1501 · Cost                              | 116,334.80    |
| 1502 · Depreciation                      | -116,382.40   |
| Total 1500 · Computer Equipment          | -47.60        |
|                                          |               |
| 1600 · Furniture                         |               |
| 1601 · Cost                              | 30,451.91     |
| 1602 · Depreciation                      | -21,958.30    |
| Total 1600 · Furniture                   | 8,493.61      |
|                                          |               |
| 1700 · Office Equipment                  |               |
| 1701 · Cost                              | 59,158.94     |
| 1702 · Depreciation                      | -59,158.94    |
| Total 1700 · Office Equipment            | 0.00          |
|                                          |               |
| 1800 · Software                          |               |
| 1801 · Cost                              | 107,136.69    |
| 1802 · Depreciation                      | -50,309.78    |
| Total 1800 · Software                    | 56,826.91     |
|                                          |               |
| 2000 · Web Development                   |               |
| 2001 · Cost                              | 31,298.60     |
| 2002 · Depreciation                      | -31,298.60    |
| Total 2000 · Web Development             | 0.00          |
|                                          |               |
| **Total Fixed Assets**                   | 91,332.85     |
|                                          |               |
| **TOTAL ASSETS**                         | **3,612,763.83** |
|                                          |               |
| **LIABILITIES & EQUITY**                 |               |
| **Liabilities**                          |               |
| **Current Liabilities**                  |               |
| **Accounts Payable**                     |               |
| 3000 · Accounts Payable                  | 1,265,468.48  |
| **Total Accounts Payable**               | 1,265,468.48  |
|                                          |               |
| **Credit Cards**                         |               |
| 701 · Corp-3981                          | 44,595.11     |
| 702 · CRD-0851                           | 21,867.56     |

|  | Jan 6, 11 |
|---|---|
| **703 · CRD-2086** | 19,141.42 |
| **Total Credit Cards** | 85,604.09 |
| | |
| **Other Current Liabilities** | |
| **2105 · Accrued Salaries reduced May 08** | 76,790.39 |
| **3020 · Capital Lease-Computers 07 & 08** | 1,762.35 |
| **3050 · Capital Lease-Photocopier** | -7,662.09 |
| **3120 · Deferred Purchase Price TGI** | 373,256.78 |
| **3148 · Loan DMG Int** | 21,250.00 |
| **3149 · 2002 Markowicz Fam BP Trust-Int** | 166,000.00 |
| **3150 · Loan Note Int(EM)** | 178,307.25 |
| **3152 · Loan EB (2) Int** | 31,791.68 |
| **3154 · Enhanced Capital Int** | 187,317.29 |
| **3155 · ME Investment Int** | 88,846.08 |
| **3156 · A.Paul Int** | 96,249.92 |
| **3157 · J.Kaiden Int** | 16,288.36 |
| **3158 · Pondfield Investments Int** | 79,961.58 |
| **3159 · Ephraim Barsam Int** | 32,393.60 |
| **3160 · Enhanced Capital Int (Loan 2)** | 8,020.83 |
| **3161 · A.Paul Int (Loan 2)** | 18,312.52 |
| **3452 · Loan EB** | 124,374.26 |
| **3455 · Intercompany Acct HT** | 6,000.00 |
| **3457 · State Tax Payable** | 816.00 |
| **3458 · Payroll Clearing Acct** | 909,858.65 |
| **3459 · Factoring Acct (Crestmark)** | 216,251.93 |
| **3460 · Intercompany Acct-TGI** | 56,937.70 |
| **3462 · Pension Acct (401K)** | 953.69 |
| **Total Other Current Liabilities** | 2,684,078.77 |
| | |
| **Total Current Liabilities** | 4,035,151.34 |
| | |
| **Long Term Liabilities** | |
| **3492 · Loan - A. Paul** | 150,000.00 |
| **3493 · HT Investors** | |
| **3493-1 · Enhanced Colorado 15% Notes** | 550,000.00 |
| **3493-2 · Enhanced Colorado 9% Notes** | 169,230.76 |
| **3493-3 · M E Investment 15% Notes** | 250,000.00 |
| **3493-4 · M E Investment 9% Notes** | 76,923.08 |
| **3493-5 · Pondfield Holding 15% notes** | 200,000.00 |
| **3493-6 · Pondfield Holdings 9% Notes** | 61,538.46 |
| **3493-7 · Jon Kaiden 15% Notes** | 50,000.00 |
| **3493-8 · Jon Kaiden 9% Notes** | 15,384.62 |
| **3493-9 · Andrew M Paul 15% Notes** | 250,000.00 |
| **3493-10 · Andrew M Paul 9% Notes** | 76,923.08 |
| **3493-11 · Loan from Enhanced April 2010** | 112,500.00 |

|                                              | Jan 6, 11       |
| -------------------------------------------- | --------------- |
| **3493-12 · Loan A.Paul April 2010**         | 112,500.00      |
| **Total 3493 · HT Investors**                | 1,925,000.00    |
|                                              |                 |
| **3494 · NIP Investors**                     |                 |
| **3494-1 · 2002 Markowicz Family BP Trust**  | 1,000,000.00    |
| **3494-2 · Loan Note (EM)**                  | 565,783.27      |
| **3494-3 · Loan DMG**                        | 68,000.00       |
| **3494-4 · Loan Received (E.Barsam)**        | 99,696.33       |
| **Total 3494 · NIP Investors**               | 1,733,479.60    |
|                                              |                 |
| **3497 · EB Loan Note (2)**                  | 39,005.60       |
| **3498 · Wells Fargo Loan (EM3)**            | 24,726.96       |
| **3500 · External Investment Loan DMG**      | 35,816.24       |
| **Total Long Term Liabilities**              | 3,908,028.40    |
|                                              |                 |
| **Total Liabilities**                        | 7,943,179.74    |
|                                              |                 |
| **Equity**                                   |                 |
| **3800 · Common Stock**                      | 50,000.00       |
| **3900 · Retained Earnings**                 | -3,192,448.81   |
| **Net Income**                               | -1,187,967.10   |
| **Total Equity**                             | -4,330,415.91   |
|                                              |                 |
| **TOTAL LIABILITIES & EQUITY**               | 3,612,763.83    |